**McDONNELL DOUGLAS CORPORATION and General Dynamics Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 91–1204C.**

United States Court of Federal Claims.

April 8, 1996.

Francis M. Gaffney and Caryl A. Potter, III, Sonnenschein, Nath & Rosenthal, St. Louis, Missouri, for plaintiff McDonnell Douglas Corporation; Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, Washington, D.C., for plaintiff General Dynamics Corporation.

C. Coleman Bird, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, on brief; George P. Williams, Department of the Navy, Washington, D.C., of counsel.

## OPINION

HODGES, Judge.

This case comes before the court after almost five years of litigation regarding the termination for default of the A–12. This opinion sets forth our reasons for vacating the termination for default and converting the termination for default decision to a termination for the convenience of the Government.[1]

Plaintiffs McDonnell Douglas Corporation and General Dynamics Corporation contracted with the Navy to develop a carrier-based, low observable (Stealth) attack aircraft known as the A–12.[2] Defendant terminated the contract for default on January 7, 1991. Plaintiffs argued that the Navy terminated their contract improperly, and that the contract should be converted to a termination for the convenience of the Government. We tried this part of the case, Count XVII, and later vacated the termination for default:

1. We adopt the proposed findings of fact issued in the November 5, 1993 Order.

2. Stealthy characteristics allow aircraft to avoid detection by radar and other forms of observation. The military became very interested in this cutting-edge capability for obvious reasons. The Air Force obtained two stealth aircraft—the B–2 and the F–117A; the A–12 was the Navy's attempt at this state-of-the-art technology. The harm to national security if this technology were released could be severely damaging, so the A–12

Testimony and other evidence at trial showed that the A–12 contract was not terminated because of contractor default. The contract was terminated because the Office of the Secretary of Defense withdrew support and funding from the A–12. Prior to that, the Navy did not believe that the contractors performance justified termination for default.

*McDonnell Douglas Corp. and General Dynamics Corp. v. United States,* No. 91–1204C, Order, 1994 WL 715992 (Dec. 9, 1994).

Plaintiffs argued that this ruling meant we must convert the termination to one for convenience of the Government immediately; defendant countered that conversion would create a windfall for the contractors if they were in default without excuses as of January 7, 1991. According to defendant, a "technical violation" in terminating the contract could not justify conversion in light of plaintiffs' alleged "egregious" performance failures. The Navy's failure to exercise discretion in terminating plaintiffs for default was not a technical violation, but we agreed to hear evidence of plaintiffs' egregious conduct. We converted the termination to default to one for the convenience of the Government in December 1995, upon finding that the Navy was aware of all critical information that could have affected a termination decision.

## BACKGROUND

The Navy awarded a full-scale engineering and development (FSED) contract to the McDonnell Douglas/General Dynamics team in 1988 after competition in concept development. The incrementally funded, fixed-price incentive FSED contract had a ceiling price of $4,777,330,294 and a target price of $4,379,219,436.[3] Installment payments were

was treated as a compartmented, special access program. The Navy limited access to those individuals with high-level security clearances who had a need to know this information.

3. One member of the other team competing for the FSED contract had produced an Air Force bomber with stealthy characteristics. That team would not agree to a fixed-price contract, and its bid exceeded plaintiffs' bid by more than $400 million.

scheduled to be obligated over the five-year contract. The Navy obligated a $185,000,000 installment to the contract on November 1, 1990, and a $553,200,000 installment was scheduled for January 7, 1991.

The contractors were to produce eight FSED aircraft. The contract also provided the Navy an option to purchase four production lots of aircraft. Each FSED aircraft would test different characteristics of the A–12; stealth capabilities would be verified in the "fully capable, fully equipped" eighth aircraft that would serve as the basis for the production lots. Under the original agreement, the first FSED aircraft would be delivered in June 1990; the rest would be delivered monthly through January 1991. The Navy exercised its option on the first production lot on May 31, 1990.

Three design reviews were held during the contract. An initial design review was completed in May 1988 and the Preliminary Design Review was completed in January 1989. The Critical Design Review process, to begin after the design is essentially complete, began in June 1990.

### A. Problems with Performance

The parties were aware of problems in the performance of this contract, namely controlling the growth of the aircraft weight and meeting the contract schedule. Contracting Officer Michael Mutty knew during early 1990 that the contractors would not meet the June delivery date for the first FSED aircraft, yet he took no action to terminate the contract then. When the contractors did not meet the first flight date in June, Mutty noted serious concern regarding performance and asked plaintiffs for an estimate of when the first aircraft would be delivered.

The contractors proposed a new schedule. They asserted claims for changes to the contract, partly due to impossibility of performance and nondisclosure of superior knowledge. The contractors' estimates showed that the projected costs would exceed the contract ceiling price by $324 million. Negotiations on a new schedule were not successful. On August 17, the Navy unilaterally issued contract modification P00046 setting the date for first flight as December 31, 1991. It did not terminate the contract then.

The projected weight was a concern throughout contract performance.[4] The contractors' Best and Final Offer (BAFO) design proposal for the aircraft had indicated a weight empty for the aircraft. At that weight, the aircraft was predicted to meet needed performance characteristics.

Problems in meeting the BAFO weight surfaced around September 1988. The Contracting Officer believed that the contractors would overcome the problems. In late 1989, the CO was concerned that the BAFO weight would not be possible, but he did not issue a cure notice. The Navy believed that the aircraft's other performance characteristics would meet its needs even if the aircraft were not at the originally predicted weight.

In January 1990, the Navy estimated that the aircraft in the first production lot would weigh 7930 pounds over BAFO.[5] The contractors' estimate was less. The Navy obligated the scheduled payment of $1.05 billion that month. The CO did not issue a cure notice.

### B. Major Aircraft Review

The Department of Defense initiated a Major Aircraft Review at the beginning of 1990 to consider its major aircraft programs in light of a diminishing threat and a changing world situation. Its purpose was to decide whether to continue certain programs or to cancel them. The A–12 was included in that review. Secretary of Defense Richard B. Cheney visited the McDonnell Douglas plant in March 1990 as part of the review. There he heard some concerns with production of

---

**4.** This was not an unusual concern for a research and development contract to build an aircraft.

**5.** The contractors submitted monthly weight and balance status reports estimating the weight of the eighth FSED aircraft. The reports showed the design or production weight of each part of the aircraft. As the design progressed, the weight assigned to each part could change. The status reports reflected the contractors' current view of the weight; the Navy produced its own estimate based on the contractors' reports and the Navy's assessment of the contractors' commitment to weight-reduction ideas, the technical validity of those ideas, and other subjective conclusions.

the aircraft, but he felt fairly confident that the Navy and the contractors could deliver. The conclusions drawn from the review were that the need for the A–12 remained and the Navy should pursue the program. The Secretary reported these results to Congress in April 1990.

Within weeks after his testimony before Congress, the Secretary learned of problems with the A–12. He was informed that the contractors were having schedule and cost problems that would not allow them to perform under the terms of the contract. The Secretary was disturbed by this information because of his recent testimony before Congress. He discussed his concerns with the contractors that summer.

### C. Acceptability of the A–12

In July 1990, the Navy sought to revalidate the requirements for the A–12 and to reassess its acceptability at the predicted weight of 7930 over BAFO. The question was whether the increased weight of the aircraft would affect the performance characteristics so that the Navy could not accept the aircraft. The answer was No. The aircraft would be acceptable at the increased weight. The Navy's review concluded that the aircraft would meet all operational requirements at BAFO plus 7930 pounds, which was NAVAIR's estimate of the weight of the aircraft when the first squadron would be introduced to the fleet. The report stated:

> [I]t has been determined that the A–12 aircraft, despite a projected weight growth of 7930 pounds by IOC, will continue to satisfy Navy operational requirements and is a suitable aircraft for Fleet use....
>
> \*   \*   \*   \*   \*   \*
>
> The A–12 meets or exceeds all up-and-away performance requirements and, in every instance, exceeds A–6 carrier suitability performance.

The Joint Chiefs of Staff, through the Joint Requirements Oversight Council (JROC), conducted its own review of the A–12 requirements. The November 1990 JROC report stated:

> In all cases, while the operational requirement is still the goal, the predicted perfor-

mance is a quantum improvement over current capability and is within the operational parameters of the rest of the airwing and satisfies all mission requirements.... There is nothing in these deviations from the original requirement which in the opinion of the JROC affect the fundamental reasons for developing the A–12.

An independent review by the Office of the Secretary of Defense (OSD) concurred that the A–12 program should be pursued. OSD concluded that there was no reason for terminating the A–12 after looking at whether the "technical, schedule, performance, and cost problem risks [were] sufficiently understood and resolved to warrant continuing the program."

### D. Beginning of the End

The Navy obligated $185 million in a scheduled payment at the beginning of November. A $553 million installment payment, one of the largest of the contract, was due on January 7, 1991. Long range budget decisions for Congress were due in January.

At the end of November 1990, two reports regarding the handling of the Major Aircraft Review were published. The Navy's November 28 "Beach Report" found that the Program Manager had been unreasonable in his conclusion that the contract could be completed within the contract ceiling price and that he had failed to anticipate a greater risk to the schedule. Several Navy officials, including the Program Manager, were criticized in the report. A Department of Defense Inspector General report published on November 29 concluded that the nature and extent of the problems with the A–12 were not identified correctly because the review was handled poorly and without following existing control mechanisms.

In his briefing to the President of the United States during the first week of December, the Secretary expressed his disappointment with the Navy's handling of the A–12 and the Major Aircraft Review and promised to "take action to correct the situation." The UnderSecretary of Defense for Acquisition resigned. On December 3, Secretary Cheney stated that there were "serious shortcomings in the program," and he

directed the Deputy Secretary of Defense to review the program's status and to report in 10 days.

The A–12 was discussed in a series of meetings in the following days as the Department of Defense decided whether to include certain programs in its budget requests to Congress in January. A Defense Acquisition Board reviewed the A–12 on December 7 and 11, and a Defense Procurement Review Board discussed the A–12 on December 11, 12, and 13.

On December 12, Secretary of the Navy Lawrence Garrett responded to Secretary Cheney's December 3 request for a review of the program. Garrett expressed concerns about the contractors' willingness to perform the contract in accordance with its terms. Secretary Garrett stated: "The Navy also will examine grounds upon which the contract might be terminated consistent with applicable laws and regulations on or before January 5, 1991. We will provide you our views as to whether the program should be terminated for default."

### E. OSD Directs Navy to Issue Cure Notice

Secretary Cheney sent a show cause memorandum to the Navy on Friday, December 14.

> The A–12 program is in serious trouble. The apparent schedule slippage, cost growth and management deficiencies in this program are intolerable. If we cannot spend the taxpayers' money wisely, we will not spend it. Accordingly, I direct you to show cause by January 4, 1991 why the Department should not terminate the A–12 program and pursue other alternatives.

The Navy issued a cure notice to the contractors the following Monday, December 17. Neither the Contracting Officer nor the Navy had planned to issue a cure notice; the timing was dictated by the show cause memorandum from Secretary Cheney.[6] In fact, the Department of Defense General Counsel directed the Navy to issue the cure notice and insisted on including language regarding the contractors' failure to meet specifications. The December 17 cure notice stated:

> You are notified that the Government considers your performance ... unsatisfactory. Specifically, you have failed to fabricate parts sufficient to permit final assembly in time to meet the schedule for delivery of FSED aircraft. In addition, you will not deliver the Lot I pilot production aircraft in accordance with the contract schedule. Moreover, your failure to meet specification requirements, such as aircraft weight, jeopardizes the carrier suitability of your design.

> These conditions are endangering performance of [the] contract.... Therefore, unless these conditions are cured by 2 January 1991 the Government may terminate for default under the terms and conditions of the default clause of the contract.

The Navy believed that the aircraft would meet operational needs, if not all contract specifications. At the time of the cure notice, the contractors had been negotiating with the Navy and Department of Defense officials for financial relief that would call for a restructuring of the contract, both in its terms and its allocation of costs. The Contracting Officer was awaiting the outcome of Secretary Cheney's decision under Pub.L. 85–804 regarding the extraordinary relief.[7]

---

6. Rear Admiral William R. Morris, the Assistant Commander for Contracts for Naval Air Systems Command, acted as the Contracting Officer during this time. RADM Morris oversaw management issues on thousands of contracts within his office, but he was not involved in daily matters regarding the A–12. He received information on the A–12 from Procurement Contracting Officer Mutty, but he did not know the details of contract performance or the details of the contract specifications. Mutty signed all A–12 documents throughout performance, except for the cure notice and the termination letter.

7. [T]he President may authorize any department or agency of the Government which exercises functions in connection with the national defense ... to enter into contracts or into amendments or modifications of contracts ... and to make advance payments thereon, without regard to other provisions of law relating to the making, performance, amendment, or modification of contracts, whenever he deems that such action would facilitate the national defense. The authority conferred by this section shall not be utilized to obligate the United States in an amount in excess of $50,000 without approval by an official at or above the level of an Assistant Secretary or his Deputy....

Even if 85–804 relief were not granted, the CO wanted the chance to work out the problems within the existing framework of the contract.

The Office of the Secretary of Defense assumed control over determining whether the A–12 should proceed. OSD directed the Secretary of the Navy not to negotiate with the contractors. The new UnderSecretary of Defense for Acquisition, Mr. Donald Yockey, took charge of negotiating with the contractors. The contractors' financial trouble was his primary concern.

The contractors submitted certified claims for equitable adjustments on December 31. Those claims requested an adjustment to the contract price and schedule due to superior knowledge and failure of the Government to cooperate during performance. Also on December 31, the contractors requested flexible progress payments to improve their cash flow. The contractors responded to the cure notice on January 2 by disputing that they were in default. They contended that the schedule was invalid and the specifications that allegedly they had failed to meet were unachievable.

Admiral Morris attended a briefing for the UnderSecretary of Defense for Acquisition on January 4. In that meeting, the Chief Engineer for the Navy noted that the operational requirements of the A–12 had been revalidated by the Navy and JROC and that the "technical challenges" that remained were typical for this type of development contract. The Chief Engineer believed that the contractors could overcome the technical problems.

### F. Cheney Denies 85–804 Relief

On January 5, a Saturday, Secretary Cheney met with the Secretary of the Navy, the UnderSecretary of Defense for Acquisition, the Navy General Counsel, and the Chairman of the Joint Chiefs of Staff to discuss budgets and the A–12. "And there was also this question of whether or not an additional payment [of $553,200,000] would be made to the contractors on the following Monday," according to Secretary Cheney. The Contracting Officer was not present for this discussion.

Secretary Cheney considered three options: (1) Grant 85–804 relief by providing additional funds and changing the terms of the contract, (2) Direct the contractors to perform, or (3) Terminate the A–12. Cheney understood that the Navy wanted to continue the program and force the contractors to perform according to the terms of the contract. Cheney did not believe that this was reasonable because the contractors had indicated already that they could not meet the current contract.

Other advisers, namely USD(A) Yockey, recommended against both 85–804 relief and the continuation of the program because the contractors were not willing to accept a sufficient loss on the contract. UnderSecretary of Defense for Acquisition Yockey believed that 85–804 would look like a bailout of the contractors. The only alternative Yockey thought appropriate was termination. He wanted to terminate for default immediately, before more funds were obligated.[8]

The Secretary of Defense decided not to grant 85–804 relief. He believed that the natural consequence of his decision not to grant 85–804 relief would be that the program would be cancelled and that the Navy would have to terminate the contract.[9] Che-

---

Pub.L. No. 85–804, 72 Stat. 972 (1958). A report justifying those decisions obligating the United States to more than $50,000 must be presented to the President. *Id.*

8. Those facts are not in dispute, though we do not know for certain what Mr. Yockey believed. Mr. Yockey did not testify because all of the parties acknowledged that he remembers virtually nothing about the weekend in question.

9. Secretary Cheney's own perception of his role in the termination of the A–12 was somewhat unclear. He stated repeatedly in court that his decision with regard to the A–12 was only to deny 85–804 relief. The decision to terminate the contract, according to his trial testimony, was left to the Navy.

Q: And in fact, your decision was to terminate the contract for default, isn't that right?
A: My decision was to refuse to grant 85–804 relief, with the expectation of having done that that would lead to the cancellation of the program ..., and ... when I decided not to grant 85–804 relief that meant the end of the program, that the Navy would then be responsible for terminating the contract. And based on everything I had seen up until then, I would

ney was not well-versed in government contracts; he was not aware of the procedure or proper bases for terminating a contract. He did not have a working knowledge of the contractors' equitable adjustment claims or their excuses for alleged non-performance. He did not review the claims of the contractors or the Government. His concerns were limited to cost and schedule. Secretary Cheney informed Secretary Garrett later that day of his decision.

### G. OSD Withdraws Support

Admiral Morris was called in to meet with Mr. Yockey and other Defense Department officials at the Pentagon on Sunday afternoon, January 6. Admiral Morris was unaware of the outcome of the meeting that Secretary Cheney had with Navy officials the day before. In fact, Admiral Morris was scheduled to be on vacation that weekend. His plans changed on Friday afternoon when Mr. Yockey required him to attend the Sunday meeting.

Admiral Morris learned from Mr. Yockey at the meeting that Secretary Cheney would not support 85–804 relief, that Mr. Yockey, as the Under Secretary of Defense for Acqui-

sition, could not support continuation of the program, and that Mr. Yockey would not authorize the expenditure or obligation of any more funds to the program. Yockey's decision was clear to Morris: "I, Yockey, as the milestone decision authority, can no longer support the program because of cost, schedule, performance problems, and I will not authorize the obligation of any additional funds for the program."

Admiral Morris argued for the opportunity to resolve the issues without extraordinary relief under Pub.L. 85–804. He thought that discussions with the contractors were not conclusive, and he did not believe that 85–804 relief was the only way of addressing the issues. He sought an opportunity to provide assurances that the program could be sustained. Mr. Yockey repeated that no additional funds would be obligated.

Admiral Morris was stunned by the meeting with Yockey. He had not anticipated termination of the A–12 contract. Soon after the meeting, he told the Navy's service acquisition representative that he probably would terminate the contract for default the following day.

---

have been surprised if they had terminated the contract on any other basis.

In a letter to the President on January 4, 1991, Secretary Cheney focused on his role in assessing the contractors' performance status:

Although I have not yet made a final decision, we may have little choice but to terminate the contract due to the companies' default on the contract obligations. . . . If I conclude that it is necessary to terminate the A–12 program due to the contractors' failure to perform, the department will pursue other more affordable approaches.

In testimony before the House Armed Services Committee in 1991, Secretary Cheney stated:

The A–12, I did terminate. It was not an easy decision to make because it is an important requirement that we are trying to fulfill. But no one could tell me how much the program was going to cost, even just through the full-scale development phase, or when it would be available. Data that had been presented at one point a few months ago turned out to be invalid and inaccurate. So after agonizing over it, I made a decision to shut down the program. I think it was the right decision. [Emphasis added.]

Months later before the Senate, Secretary Cheney attempted to clarify his position. He only decided not to grant 85–804 relief, which then led to the termination:

In terms of killing the A–12, technically what happened—it is important for the record to reflect this—I made the decision not to come back to Congress to ask for billions more to bail out the contracts for the particular phase of the A–12 program that we were in. The Navy then made the decision to terminate the contract. Technically, that is what transpired.

In his June 30, 1993 deposition, Secretary Cheney apparently took responsibility for the termination for default decision: "The IG has generally done good work for the Department of Defense. I don't always agree with them, but sometimes they produce good results. In this particular case, *they recommended termination for default, which is what I ultimately did.*" [Emphasis added.] Government counsel presented the Secretary with an errata sheet after his deposition. Cheney agreed that government counsel's suggestions of error more accurately reflected what he believed occurred. Government counsel argued that the alteration to the deposition was proper and that the third sentence in the quoted excerpt should read, "In this particular case, *we* recommended termination for default which is what *we* ultimately did." [Emphasis added.] These changes were provided to plaintiffs' counsel the morning of Secretary Cheney's trial testimony.

Admiral Morris' disappointment was manifest. He told his wife that evening that "it had been a long, tough day and I hadn't been the winner." He called his immediate superior, Admiral Gentz, at home and told him the Secretary of Defense would not grant 85–804 relief and that Yockey would not support the program. Morris hoped that Gentz could encourage the "big guns" in the Fleet to make a last-ditch effort to save the program. If not, Morris said he would have to terminate the contract for default the next day.

Admiral Morris wanted to address the problems that he believed led to OSD's decision.[10] He believed that the plane, even with its deficiencies, would do the job. He was not sure of the timing, cost, and whether the Navy would get everything it wanted, but he planned to discuss those matters with the contractors on Monday morning.

Admiral Morris was left with little time to carry out those intentions. A $553 million progress payment was due to the contractors on Monday. On Sunday afternoon, he contacted NAVAIR legal counsel, Margaret A. Olsen, and told her that he was prepared to terminate the A–12 contract for default the next day. He directed her to prepare a termination for default memorandum. She had not anticipated a termination for default

on the A–12. She suggested that a termination memorandum from an earlier Navy program, the P–7, be used as a "baseline" for the A–12 memorandum because of the short time frame within which to make the decision.[11]

### H. Monday Morning Rush

Ms. Olsen began working on the termination memorandum early Monday morning before Admiral Morris arrived. She edited the P–7 termination memorandum on her computer, deleting information that she believed to be peculiar to that contract.[12] Olsen had little information regarding the A–12 at her disposal when preparing the memorandum. She was generally aware of correspondence and conversations that had occurred between the contractors and the Navy. She had not reviewed the contractors' claims, and she had not seen the contractors' response to the cure notice. She directed her staff of attorneys that morning to gather specific information about the A–12. Ms. Olsen did not consult with Admiral Morris about the basis for termination. She did not discuss the termination with the chief engineer, the program manager, or technical personnel.

Morris did not review any A–12 contract documents in preparation for the termi-

---

**10.** Morris "felt the heavy responsibility of doing everything that [he] possibly could do to try to reverse [Yockey's] decision."

**11.** The use of a draft memorandum was not unusual. Ms. Olsen used a draft memorandum written by the P–7 procurement contracting officer in developing the final termination memorandum for the file on the P–7. What was unusual is that the draft memorandum used in preparation of the A–12 termination memorandum for the file was not from Contracting Officer Mutty or from the A–12, but from an entirely different program. Both the A–12 and P–7 were Navy aircraft, but they had distinctly different missions. In fact, defendant attempted to withhold P–7 documents during discovery because the P–7 program was "irrelevant" to this litigation. Admiral Morris and Ms. Olsen had no reservations in relying on this "irrelevant" program for the substance of the termination memorandum for the A–12.

**12.** The A–12 termination memorandum includes excerpts from the P–7 memorandum that are not relevant to the A–12. For example:

Specifically, the team cannot meet the performance requirements of the contract. The team

is currently designing the aircraft to have a weight empty 7930 pounds in excess of the guaranteed contract weight empty. *This additional weight precludes the team from meeting contract requirements for takeoff distance, cruise specific range, maximum airspeed and fuel flow, all of which affect mission capability.* [Emphasis supplied.]

The A–12 had no "takeoff distance" requirement because it was a carrier aircraft.

The memorandum focused on the schedule delays in performance, attributing them to the contractors. The paragraph that specifically discussed the amount of delay expected began:

Since June 1990, the team has consistently reported its delays; and the Navy's independent review confirmed that, given the state of the team's development efforts, delivery of aircraft and completion of related contract requirements could occur no sooner than. [sic]

The sentence stops short of a prediction, even though the contractors and the Navy discussed estimations earlier in the year. The Navy had told Secretary Cheney that the first flight date was expected in September 1992.

nation. He did not consult with technical personnel. He did not review the FAR provisions concerning a decision to terminate for default. His review of documents was limited to those related to the weight of the aircraft, and then only to check whether the number "7930" used in the termination memorandum was correct. He did not review documents related to schedule or specifications. Morris approved the termination memorandum at midday after less than an hour of review.

Morris faced three alternatives: terminate the contract for convenience, terminate the contract for default, or continue the contract. Admiral Morris wanted to continue the contract.[13]

He dismissed the option to continue, however, because Yockey would not release the payment due that day. Morris thought that the failure to release the payment would put the Government in breach of contract. He felt that he had no choice but to terminate. Admiral Morris based the termination on the fault of the contractors because he did not believe that the Navy bore any responsibility for the contractors' perceived inability to achieve the contract specifications or deliver the aircraft on schedule. Absent some fault on the part of the Navy, he believed that he could not terminate for convenience because he believed that action would result in a windfall to the contractors.

The termination letter sent to the contractors stated that they were being terminated for default for an "inability to complete the design, development, fabrication, assembly and test of the A–12 aircraft within the contract schedule and the Team's inability to deliver an aircraft that meets contract requirements." The letter stated that the contractors had

> failed to explain or cure those conditions [noted in the December 17 cure notice], and that the Team is in default of the contract for having failed to make progress and not meeting contract requirements. The A–12 aircraft will not be delivered

within the contract schedule nor will it meet the weight guaranty contained within the contract specification.

## DISCUSSION

### I.

■ Default termination is a serious matter. It is a drastic sanction that subjects the contractor to forfeiture. *DeVito v. United States,* 188 Ct.Cl. 979, 990, 413 F.2d 1147 (1969).

■ The Default Clause of a government contract gives the Government the right to terminate a contract. It does not require that the Government "terminate on a finding of bare default, but merely gives the procuring agency discretion to do so." *Sol O. Schlesinger v. United States,* 182 Ct.Cl. 571, 581, 390 F.2d 702 (1968). This discretion must be exercised and exercised reasonably in a decision to terminate a government contract. 182 Ct.Cl. at 581, 390 F.2d 702; *Darwin Construction Co., Inc. v. United States,* 811 F.2d 593, 596 (Fed.Cir.1987).

■ The termination clause of the contract cannot be used as a "device" to rid the Government of its contractual responsibilities. That is "an abdication of responsibility which cannot be sanctioned." *Composite Laminates v. United States,* 27 Fed.Cl. 310, 326 (1992) (citing *Schlesinger,* 182 Ct.Cl. at 581, 390 F.2d 702); *see also John A. Johnson Contracting Corp. v. United States,* 132 Ct. Cl. 645, 132 F.Supp. 698 (1955).

■ Procurement officials must use judgment in deciding whether to terminate a contract for default; they cannot act as "automatons." *Schlesinger,* 182 Ct.Cl. at 581, 390 F.2d 702. If the contracting officer were "improperly influenced by ... anyone else to terminate the contract for default rather than to exercise his own independent judgment in the light of the factors set out in the regulations, it would represent an abdication rather than an exercise of his discretion." *Fairfield Scientific Corp. v. United States,*

---

**13.** Admiral Morris testified at trial:

Q: Under [Yockey's] guidelines, you couldn't do the one thing that you wanted to do, what you told him you wanted to do, and that was

continue the contract and negotiate with the contractors, correct?
A: That's correct.

222 Ct.Cl. 167, 182, 611 F.2d 854 (1979). The Government must make its decision on the merits of a contractor's performance, considering alleged defaults as well as excuses therefor. The procurement official must assess all of the relevant circumstances of the contract, and not blindly accept directions from others. *Schlesinger*, 182 Ct.Cl. 571, 390 F.2d 702; *see also Jamco Constructors, Inc.*, VABCA Nos. 3516T, 3271, 94–1 B.C.A. ¶ 26,-405 at 131,361–362, 1993 WL 393670 (1993), *reconsideration denied*, 94–2 B.C.A. ¶ 26,792, 1994 WL 64186 (1994).

■ The FAR provides valuable guidance for deciding whether to terminate. First, "the Government *shall* decide which type of termination action to take ... only after review by contracting and technical personnel, and by counsel, to ensure the propriety of the proposed action." FAR 49.402.3(a) (emphasis supplied).

The contracting officer *shall* consider the following factors in determining whether to terminate a contract for default:

(1) The terms of the contract and applicable laws and regulations.

(2) The specific failure of the contractor and the excuses for the failure.

(3) The availability of the supplies or services from other sources.

(4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.

(5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.

(6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.

(7) Any other pertinent facts and circumstances.

FAR 49.402–3(f) (emphasis supplied). The Government should consider those factors when deciding whether to terminate for default.[14] Failure to do so is probative evidence that the decision was made precipitously, and without consideration of the relevant circumstances leading to termination for default. *Darwin*, 811 F.2d at 598; *DCX, Inc. v. Perry, Secretary of Defense*, 79 F.3d 132, 135 (Fed.Cir.1996) ("compliance or noncompliance with section 49.402–3(f) may aid ... court in determining" whether termination for default was improperly made); *Lafayette Coal Company*, ASBCA No. 32,174, 89–3 B.C.A. ¶ 21,-963 at 110,482, 1989 WL 74885 (1989) ("Failure to consider one or more of the factors should not invalidate a termination for default where the totality of the circumstances demonstrates a reasonable exercise of discretion any more than mere lip service to the factors should insulate a termination from scrutiny."); *Jamco Constructors*, 94–1 B.C.A. at 131,361 ("The exercise of discretion involves more than a *pro forma* check off of factors drawn from FAR 49.402–3(f).").

■ The Government's failure to use reasoned discretion when terminating a contract is not a procedural defect that it may correct later. The Court of Claims has refused to sanction such actions. *Schlesinger*, 182 Ct.Cl. at 584, 390 F.2d 702. An improper termination is set aside and the termination for default is converted to a termination for the convenience of the Government. 182 Ct.Cl. at 584, 390 F.2d 702 (proper remedy where the Government abdicates its discretion is to convert the termination for default to one for the convenience of the Government); *see also Darwin*, 811 F.2d at 598 (when a court finds that the contracting officer's default decision was improperly made it will be set aside).

## II.

The *Schlesinger* court vacated the termination because it was not issued for contrac-

---

**14.** While we emphasize the mandatory language of the regulations, we do not decide this case on that basis. That is, we do not rule that defendant was obliged to consider every FAR factor. Such consideration would have been valuable evidence that defendant did not fail to exercise any discretion. Morris was not permitted to do so. That is the finding of this court: Neither Morris nor anyone else in the Navy was permitted to exercise discretion in terminating this contract.

tor default. In that case, "Plaintiff's status of technical default served only as a useful pretext for the taking of action felt to be necessary on other grounds unrelated to the plaintiff's performance...." 182 Ct.Cl. at 583–84, 390 F.2d 702. The Navy and its contracting officer succumbed to pressure to terminate without regard to the circumstances of performance and the contract. In sum, "the Navy simply surrendered its power of choice" in deciding to terminate, and the default termination was improper. *Id.* at 581, 390 F.2d 702. The termination for default was converted to one for the convenience of the Government.

This case is strikingly similar to *Schlesinger*. The procurement in *Schlesinger* was under Congressional scrutiny and there were implications that the contract should be cancelled. Navy officials responded by instructing the contracting officer to terminate the contract if there were no urgent need for the goods. The contracting officer found no urgent need, though the Navy had approved work on the contract until then and had "waived" a missed delivery date only months earlier.[15] With that finding, Navy officials directed the contracting officer to consider the facts and check with legal counsel to determine whether the contract could be terminated for default. When the contracting officer learned that the contractor would not meet the next delivery date, Navy officials instructed him to "[t]erminate contract * * * immediately for default." *Id.* at 578 (so in original).

■ The Navy could have terminated for convenience, terminated for default, or continued the contract in this case and in *Schlesinger*. Instead, the Navy "acted as if it had no option but to terminate for default (barring all compensation)." *Id.* at 582, 390 F.2d 702. It did not consider excuses for default or whether the termination should be for convenience. Here, and in *Schlesinger*, the agency's actions before termination had not revealed a desire to terminate. The decision to terminate was made hastily without consideration of relevant facts. No one exercised discretion. Both the contracting officer and the agency felt that they had no choice but to terminate for default.

The Navy's surrender of "its power of choice" in dealing with the A–12 is apparent. It had overlooked the contractors' alleged defaults for months. The contractors missed a delivery date for the first FSD aircraft, and the Government excused it with a unilateral contract modification. The contractors reported that they would not meet the Best and Final Offer weight, and the Government determined that the aircraft still would meet operational requirements.[16]

The contracting officer did not contemplate issuing a cure notice in December. The Navy did not believe the contractors' performance justified termination. The show cause memo from the Secretary of Defense's Office set the wheels in motion. Indeed, OSD directed both the timing and the substance of the cure notice.

The termination of this contract was controlled by OSD's directive to issue a cure notice. Admiral Morris' rush to terminate the contract makes sense only in light of OSD's December 15 show cause letter. Morris had not contemplated issuing a cure notice until the Navy received that directive. No performance-related event prompted the cure notice.[17] The Navy capitulated. The

---

15. "Waiver" was not vital to the court's decision except to establish that the Navy had overlooked earlier performance inadequacies. Yet, the Navy terminated immediately when the next delivery date was missed. The sudden change in attitude toward the contractor is most important.

16. This was a research and development contract to provide the Navy with a replacement for the A–6. The Navy wanted an aircraft with the performance characteristics of that plane, but with stealthy capabilities. The "operational requirements" were the goals set for development including performance needs and compatibility

with other systems. When the Navy instituted a review of the program to determine whether it wanted to pursue the A–12, it compared the performance capabilities of the A–12 at BAFO plus 7,930 pounds to the operational requirements. The Navy was satisfied that the A–12 would satisfy those goals.

17. The NAVAIR weight calculation remained constant throughout 1990 despite contractor indications of possible weight growth. The NAVAIR weights branch could have issued another estimate during the year, but did not. Admiral Morris did not question the weight calculation on

contractors' alleged, long-standing "defaults" served as the excuse for beginning a termination process.

The decision to terminate for default was dictated by the Office of the Secretary of Defense's representations that it would not support the program. Morris could not proceed with the one option that he felt was appropriate—to continue the contract. Admiral Morris and the Navy believed that the aircraft would meet operational requirements. The Navy's actions after the cure notice did not show that it believed the contract should be terminated. Secretary Garrett argued for continuation of performance under the contract at a January 5 meeting. None of the participants except Yockey asserted that the contractors would be unable to develop an aircraft which suited the Navy's operational needs. Yockey's conclusion is insupportable.

The Navy lost all control over the A–12 when the Secretary of Defense's Office took over negotiations with the contractors. OSD's concerns were financial. The contracting officer was left with no discretion whether to terminate the A–12 contract when Mr. Yockey decided that he would no longer support the A–12. In the end, the contract was not terminated because of contractor default. It was terminated because the Office of the Secretary of Defense withdrew support and funding. "[T]he Navy acted as if it had no option but to terminate for default." *Schlesinger*, 182 Ct.Cl. at 582, 390 F.2d 702.

The contracting officer's use of contractor default was based on his general familiarity with the contractors' performance, which previously he had not believed justified a default termination. He did not consult with technical personnel. He did not review the contractors' claims for equitable adjustments. He could not give adequate attention to the

claims that may have excused the alleged defaults in that time, especially those involving superior knowledge issues.[18]

Those individuals who prepared the termination memorandum for the file were not informed by the contracting officer of the chosen grounds for termination. The memorandum was cribbed from another program.[19]

■ The reasons for default termination thrust upon Admiral Morris were faulty. If plaintiffs were in default, this did not require a termination for default *a priori*.[20] The Government's interests are not necessarily served by such action. A contracting agency must look beyond mere default and consider the interests both of the Government and the contractors. If the contractor's defaults are excusable, the contracting officer cannot terminate for default.

This contracting officer preferred alternatives to termination for the reasons contemplated by the FAR. Influences that he could not resist thwarted his instincts. Neither Admiral Morris nor anyone else in the Navy or OSD reviewed the FAR factors in connection with the decision to terminate. Secretary Cheney was not familiar with the FAR; we have no reason to think that Mr. Yockey was. Admiral Morris knew about the FAR inquiries. The termination memorandum shows that consideration of the FAR factors was non-existent. The entire termination procedure was *pro forma* at best.

### III.

Nothing in *Schlesinger* justifies a different result here. "Such abdication of responsibility [this court has] always refused to sanction where there is administrative discretion under a contract.... This protective rule should have special application for a default-termination which has the drastic conse-

---

January 7 other than to review his files to see if that number was correct. Ms. Olsen did not question that number at the time of termination.

**18.** Information moves slowly in the world of classified, compartmented information. To some it does not move at all.

**19.** The Government argues that this is an internal document, and it may be, but the manner in

which it was prepared provides evidence of improper termination in the circumstances of this case.

**20.** Morris' concern for the public fisc, while admirable, could not be the sole basis for concluding that the contract must be terminated for default, thereby placing the weight of a decision to terminate the program on the contractors.

quence of leaving the contractor without any further compensation." 182 Ct.Cl. at 584, 390 F.2d 702 (citations omitted).

The Navy acted as if it had no choice but to terminate for default in both cases. The reason for the Navy's dilemma does not matter. What does matter is that the reasons were not contractor performance or default.

The *Schlesinger* court did not base its decision on the contracting officer's failure to exercise his own judgment. Neither do we. The power to terminate may rest with "the Government," but no one in the Government exercised discretion in terminating this contract for default. *Id.* at 583, 390 F.2d 702. Government counsel attempted to distance the Secretary of Defense and his office from the decision to terminate the contract. Their concerns were cost and schedule.

■ The authority to grant 85–804 relief rests with the Secretary of Defense. The Secretary explained at trial that his action on plaintiffs' 85–804 application did not amount to a termination of the contract. He testified that his decision was not to terminate the contract, but to deny extraordinary relief to the program.

It does not matter whether the Secretary was correct about the scope or effect of his decision. Secretary Cheney did not review the contract, and he did not consider contractor defaults or any reasons that might have excused those defaults. He did not weigh the merits of different types of terminations or the option of going forward. *See Schlesinger,* 182 Ct.Cl. 571, 390 F.2d 702. Perhaps he could have terminated the contract—we had no reason to address this issue. We did not consider whether Secretary Cheney or anyone in his office could have directed the termination for default because the Government offered no individual or entity other than the contracting officer as the decision-maker. In fact, defendant's witnesses disclaimed such a function during trial. Neither the Secretary of Defense nor anyone else in DOD exercised discretion in the process; no consideration of the contract's circumstances

occurred. *See* 182 Ct.Cl. at 584, 390 F.2d 702. If the Secretary did terminate the contract, the reason was not for contractor default.

Defendant argues that the role OSD did play in the termination does not nullify the default termination. According to defendant, the termination for default was the "direct consequence of a legitimate exercise of OSD's statutory and regulatory oversight authority; [t]hat the discretion of the contracting officer regarding contract continuation may have been obviated by OSD's actions is of no consequence." In effect, defendant argues that the Secretary's authority overrides all contractual obligations of the United States. This argument suggests that most government contracts are illusory.

Defendant contends that *Congress Construction Corp. v. United States,* 161 Ct.Cl. 50, 55, 314 F.2d 527 (1963), *cert. denied,* 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52 (1963), supports this notion. The Court of Claims held in that case:

[W]hen purely executive functions of a discretionary nature are imposed on a subordinate official of the Government it is an implied condition that his actions (before they have become final) are subject to the review and supervision of his superiors—if the superior is authorized to intervene in that particular field and does so in time.

The Court in *Congress Construction* assumed without deciding that the Navy was "legally bound to plaintiff to make a good faith attempt" to convince Congress that certain properties should be purchased. The purchase was contingent upon congressional approval, and both parties knew it. The Court speculated that some implied duty might have arisen, but there was no contract. Defendant's reliance on *Congress Construction* is erroneous.

The Secretary of Defense did not want to continue the program. The Navy could have terminated for convenience or continued the contract upon learning of these views.[21] Admiral Morris did not see this as an option because of the cost to the Government. The

---

21. As in *Schlesinger,* the termination for convenience clause "could have been used to end performance if the Navy thought it well to do so

on learning of the Senate committee's views." 182 Ct.Cl. at 584, 390 F.2d 702.

Navy used alleged defaults that were long-standing issues between the parties that previously it did not believe justified terminating the contract for default.

## IV.

■ The Navy's less harsh position regarding contract specifications—specifically, weight—during contract performance confirms that the termination for default was improper. The Navy accepted the overweight condition of the aircraft. It was willing to continue. The contractors in fact did continue for months because no one expected them to meet the BAFO estimate. Yet DoD directed the Navy to include "weight" as a basis for termination in the cure notice. That was a pretext.

The Navy knew in September 1989 that the contractors could not meet the weight predicted in their Best and Final Offer. In October, the Navy encouraged the contractors to stop worrying about weight and focus on manufacture and assembly. The Navy did not threaten to issue a cure notice then.

The Navy determined in May 1990 that the weight would be 7930 pounds over BAFO. It knew that the original predicted weight was unachievable. All the parties did. Yet no cure notice was issued or threatened then. Plaintiffs pursued weight reduction programs vigorously at the Navy's request. No one thought that the contractors would meet the BAFO weight. The Navy's and the contractors' concern was that the weight not continue to increase. "7930 pounds over BAFO" was the benchmark for weight-reduction efforts.

The contractors notified the Navy on June 13 that they could not meet the BAFO estimate. They requested a revision of the contract. This letter documents the contractors' belief that the BAFO weight had been waived. While the BAFO weight still was in

effect, no one believed that it could be achieved. The Navy only wanted an aircraft that could meet its operational needs. The contractors continued to perform.

At termination, the Navy had known for at least eight months that the contractors could not meet the BAFO weight, and the Navy accepted it. Its strategy was to maintain the original contract until the end, then exact consideration for the contractors failure to meet the BAFO weight. It did not want to put the contractors in default.

The contractors relied on the Navy's directions to continue performance despite their failure to meet the BAFO weight. The Navy wanted an aircraft that would meet its operational needs, and plaintiffs design did so at 7930 pounds overweight.[22] In response, the contractors no longer strived to meet BAFO weight.

The weight remained stable throughout 1990 according to the Navy, although there were indications from the contractors of potential weight increases. The Navy pressured the contractors during the summer of 1990 to keep the weight growth under 8000 over BAFO. An extra 70 pounds could not have caused great problems with carrier suitability or the Navy's satisfaction with the aircraft's projected performance.[23]

The Navy and the A–12 were under intense scrutiny during the spring and summer of 1990. The Major Aircraft Review had been a disaster, and Secretary Cheney was concerned. One concern was a perceived inability of the contractors to control the weight growth. Weight growth of an aircraft is not unusual in a research and development program, and weight control always has tradeoffs. The tradeoffs in this instance were acceptable. It was the *appearance* of the inability to control the weight growth

**22.** The 7930 figure was the subject of much debate. As discussed earlier, the 7930 estimate was a government number derived from the contractors' monthly weight and balance status reports. From those reports, the Navy assessed the contractors' commitment to certain weight reduction ideas, analyzed the technical validity of those ideas, and made other subjective conclusions. Throughout 1990, the contractors' estimate was almost 1000 pounds less than the Navy

number. The Navy's estimate was no more authoritative than the contractors' numbers. The Navy's assessment of carrier suitability would not necessarily have changed with a higher estimate.

**23.** The "strike weight" of the aircraft was 79,000 pounds.

that was more damaging to the Navy than the qualitative effects of more weight.

The Navy obligated payment in the fall of 1990, knowing the limitations of the contractors' weight control efforts. At termination, Admiral Morris and NAVAIR had not changed their weight projections for at least a year. The Navy was willing to go forward with the aircraft in that condition and it allowed the contractors to continue performance with that understanding. It was not included in the cure notice until the Department of Defense General Counsel so directed. The Navy cannot support the inclusion of weight in the cure notice as a reason for termination.

### V.

#### A. Post–Hoc Justifications

■ A termination for default may be justified at trial on other grounds in some circumstances, if the Government exercised discretion in terminating the contract. *See, e.g., Pots Unlimited, Ltd. v. United States,* 220 Ct.Cl. 405, 600 F.2d 790 (1979) (citations omitted) ("[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown."). For example, if the contracting officer makes a discretionary decision to terminate, but does so for the wrong reason, the termination may be upheld. However, the reason used must have been a non-curable one, so that the contractor would not be prejudiced by the lack of a cure notice. *See College Point Boat Corp. v. United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925); *Pots Unlimited,* 220 Ct.Cl. 405, 600 F.2d 790 (violation of contract provision that prohibited sales of pottery on the property); *Joseph Morton Co. v. United States,* 3 Cl.Ct. 120 (1983), *aff'd,* 757 F.2d 1273 (Fed.Cir. 1985) (contractor fraud unknown at time of termination); *Quality Granite Construction Co., Inc.,* ASBCA No. 43846, 93–3 B.C.A. ¶ 26,073, 1993 WL 169822 (1993), *aff'd on reconsideration,* 94–1 B.C.A. ¶ 26,430, 1993 WL 409998 (1993), *aff'd,* 26 F.3d 138 (Fed.

Cir.1994) (termination for default proper for violations of Davis–Bacon Act unknown at time of termination); *Samuel T. Isaac & Associates, Inc. v. United States,* 7 Cl.Ct. 255 (1985) (criminal conduct unknown at time of termination); *Kelso v. Kirk Bros. Mechanical Contractors,* 16 F.3d 1173 (Fed.Cir.1994) (violations of Davis–Bacon Act unknown at the time of termination may subsequently support termination for default).

■ A cure notice places the contractor on notice of performance deficiencies that the Government believes will endanger the successful completion of the contract.[24] The cure notice allows the contractor to argue that the deficiencies are excused, or to provide reasonable assurances that the problems can be overcome. Thus, a termination for default is improper if the reasons stated for termination are different from the reasons given in the cure notice. *See generally Composite Laminates v. United States,* 27 Fed. Cl. 310 (the contractor must be on adequate notice of the reasons for default termination for the termination to be proper). The Government may not propose reasons for default at trial that the contractor might have cured had it been on notice of the problem during contract performance. The "post hoc" justification exception is limited to those circumstances in which the cure notice could not have been a factor; i.e., where the reason asserted at trial was non-curable.

The contracting officer did not use discretion in deciding whether to terminate the contract. Then, the contracting officer abandoned its remaining opportunity to consider whether the contract should be terminated for default. If he had used discretion, a post hoc justification might have been acceptable because a court would have had the benefit of the contracting officer's review of the FAR factors and other considerations that justified termination for default. *See Spread Information Sciences, Inc.,* ASBCA No. 48,438, 96–1 B.C.A. ¶ 27,996, 1995 WL 592785 (1995).

---

24. If a termination is predicated upon a failure to make progress so as to endanger performance, "the contracting officer shall give the contractor written notice specifying the failure and providing a period of 10 days (or longer period as necessary) in which to cure the failure." FAR 49.402–3(d).

This contract was not terminated for contractor default. We do not have the benefit of a reasoned decision. We do not know what action the contracting officer would have taken had he been permitted to exercise judgment.[25] A termination decision "issued improperly [without the exercise of discretion] ... cannot have the same status as a default-termination which is the fruit of true consideration." *Schlesinger*, 182 Ct.Cl. at 584, 390 F.2d 702.

Contractor default need not end in termination. The Government commonly elects not to terminate a contract that is in technical default, instead granting an extension or contract modification, or waiving the noncompliance. 182 Ct.Cl. at 581, 390 F.2d 702. The question remains whether there would ever be a sufficient reason in light of the Government's failure to exercise discretion for which the contractor should withstand the harsh result of a default termination, especially where the reason is given first during litigation. *See Walsky Construction Company (II)*, ASBCA No. 41,541, 94–2 B.C.A. ¶ 26,698 at 132,784, 1994 WL 43415 (1994) (where the Government abused its discretion in terminating for default, the Board stated: "Assuming, *arguendo*, that a different technical ground for default, not relied upon by the contracting officer, was established, it would not affect the outcome of this case.").

### B. Bare or Technical Default

The *Schlesinger* court agreed that the contractor was in bare or technical default at the time of termination.[26] Even so, the termination for default could not stand: "[T]he default article does not *require* the Government to terminate on finding a bare default but merely gives the procuring agency discretion to do so, and that discretion was not exercised here by the Navy." 182 Ct.Cl. at 581, 390 F.2d 702 (so in original). The court converted the termination for default to one for the convenience of the Government.

The Court's use of the words "technical" and "bare" in *Schlesinger* to describe default in the circumstances of that case is important and appropriate.[27] The contractor missed a delivery date, and although the product was in production, the Government used that default as an excuse for escaping an unwanted contract.

The contracting officer may decide that a contract should be terminated upon finding the contractor in default. Thus, the Government has the legal right to operate under the default clause for contractor shortcomings, but the court will not allow it to terminate for default when that default is pretextual.

Much of the termination decision depends on the nature of the performance problems, expectations of the outcome, whether the Government will receive its needs even if not within specifications, and other considerations that properly are left to the procuring agency.[28] A technical or bare default may result more often than not in a continuation

---

**25.** Although we do know that this contracting officer's desire was to continue the contract.

**26.** That case uses the terms repeatedly. "As the Board found, plaintiff was at least in technical default when his contract was terminated on July 1st. He was required to deliver 15,000 caps by June 30th and did not do so." 182 Ct.Cl. at 580, 390 F.2d 702. "Our difficulty is that the default article does not *require* the Government to terminate on finding a bare default but merely gives the procuring agency discretion to do so, and that discretion was not exercised here by the Navy." *Id.* at 581, 390 F.2d 702 (so in original). "We are certain that there have been a great many instances in which the Government has not terminated a contractor in technical default, but has granted an extension or waived the noncompliance." *Id.* at 581, 390 F.2d 702.

**27.** These terms are not found in the FAR, but their plain meaning evokes certain images. *Technical* means "marked by a strict legal inter-

pretation," *Webster's New Collegiate Dictionary* 1196 (1977), or "concerned with or making use of technicalities or minute, formal points." *Webster's New World Dictionary* 1373 (3d. ed. 1988). *Bare* means "without embellishment; unadorned; simple; plain" or "no more than; mere." *Webster's New World Dictionary* 110.

**28.** Contracting Officer Mutty indicated that the excess weight did not necessarily constitute the grounds for issuing a cure notice: "There are other performance requirements under the contract. You'd have to look at whether or not they were going to meet some of the other performance requirements ..." and "I guess it would depend on the degree to which it was going to be overweight, but just because it would be overweight, no, we would not automatically terminate."

of the contract. 182 Ct.Cl. at 581, 390 F.2d 702. It may be economical for the Government to receive goods late or slightly off specification than to reprocure or to go without. *DeVito*, 188 Ct.Cl. at 990, 413 F.2d at 1153 (stating that the Government is much more interested in production than in litigation).

The extent of the default may affect a contracting officer's decision whether to continue the contract. The greater and more extensive the problems, the less likely it is that a contracting officer would choose to continue the contract. In such circumstances, a termination for default is more likely. The FAR factors might provide reason to continue the contract or take other action. But that decision is one for the contracting officer and the agency to make.

■ At some point, default could be so extraordinary or egregious that the Government would have no choice but to terminate. Application of discretion would be superfluous because any rational contracting officer would be compelled to terminate for default.[29] At this extreme, any other decision by the contracting officer could be an abuse of discretion.[30] Thus, a termination imposed without the benefit of reasoned discretion could be upheld only if contractor performance were so deficient that termination for default was the only possible result.

Facts known to the Navy at the time of termination constituted no more than a technical or bare default, if that. Morris believed that the contractors were in technical default at the time of termination:

It was my belief that the contractors were technically in default of the contract, and basically, given the choices that I had, termination for convenience, termination for default, or do nothing, given the fact that I did believe they were in technical default of the contract, it would be irresponsible of me thereto to have the taxpayers and the Government pay for the adjudication of a situation where the contractors, through their failure to perform, had caused the default.

Everyone agreed that the plane would not meet the BAFO weight. The amount of excess was of little importance; the plane was still expected to meet all "operational requirements." There is no indication that any amount of weight growth would have changed the Navy's position. The contracting officer could have terminated the contractors for such problems, but he could have continued the contract and exacted consideration. The Navy was aware of all critical information it needed to make this decision.

Defendant asks us to uphold the termination for reasons that the Navy had at its disposal but did not believe justified termination for default until OSD withdrew funding. Left to its own devices, the Navy would have continued the contract in the face of such deficiencies. The Navy was not permitted this option because of OSD's action.

### C. Anticipatory Repudiation

Defendant contends that the contractors repudiated this contract by their repeated failure to provide adequate assurances when

---

**29.** Defendant argued in January 1995 that the Government had a "right to demonstrate that plaintiffs' overwhelming performance failures and defaults, including their repudiation, were material and unexcused, and that they fully justified, *if not required*, the Government's decision to terminate the contract for default." [Emphasis supplied.] In addition, "Plaintiffs apparently contend that they are entitled to the windfall of their convenience termination costs regardless of the actual *egregiousness* of their performance failures...." At a hearing, the Government pleaded that "if the default was, as we believe occurred here, *egregious and overwhelming*, then the ... violation could not have any impact on the decision to terminate for default. In other words, if the default is *so overwhelming*, it's a harmless error problem because *no reasonable contracting officer could have decided to ignore*

that default." [Emphasis added.] The term "egregious" connotes a harshness appropriate in the circumstances of this case. Indeed, only the most outrageous and flagrant of defaults could absolve the government of its wrongful termination. Defendant indicated in May 1995 that it intended to prove that the contractors' failure to disclose pertinent information regarding current and projected performance would amount to egregious default.

**30.** We told the parties before trial on Count XVII that defendant would have the chance to prove that "the contractors' performance was *so deficient* that a decision to terminate this contract on that basis would have been reasonable." June 17, 1993 Order (emphasis added).

requested, and by their indications that they would not perform the contract. Defendant asserts that repudiation is an absolute defense to the wrongful termination irrespective of whether it was asserted at termination.

■ A contracting officer may terminate a contract for default when there has been a "positive, definite, unconditional, and unequivocable manifestation of intent ... not to render the promised performance when the time fixed ... by the contract shall arrive...." *Cascade Pacific International v. United States,* 773 F.2d 287, 293 (Fed.Cir. 1985) (quoted in *United States v. Dekonty Corp.,* 922 F.2d 826, 828 (Fed.Cir.1991)). Refusal to perform may be evidenced by word or deed, but it must show that the party "absolutely refuses to perform his contract, and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party...." *Dingley v. Oler,* 117 U.S. 490, 499, 6 S.Ct. 850, 29 L.Ed. 984 (1886).

■ The contractors did not portray a *positive, definite, unconditional,* and *unequivocal* refusal to perform. The Government did not view any of their actions in this manner; no reasonable party to a contract could have. The parties were engaged in various ongoing disputes over the contract. The contractors made clear to the Navy their difficulties with the contract, and the Navy acknowledged them in many respects. Nonetheless, the contractors continued to perform. Negotiations regarding a specific avenue of relief failed. The contracting officer did not believe that the contractors would not perform; he wanted to continue the contract and address the issues with the contractors without extraordinary relief. That avenue was blocked by the Secretary of Defense, not by the contractors.[31] The contractors did not repudiate this contract.[32]

## CONCLUSION

The decision terminating the contract for default was not proper. This is not a case about the authority of the Secretary of Defense to cancel contracts or programs. The A–12 contract was not terminated because of contractor default. The contract was terminated because the Office of the Secretary of Defense withdrew support and funding from the A–12. Prior to that, the Navy did not believe that the contractors performance justified termination for default.

---

**31.** Defendant argues that Admiral Morris hoped that he "could have" negotiated a solution under the contract, implying that the contractors' repudiation prevented this. In fact, Morris could not pursue this because of OSD, not because of the contractors. Morris testified:

> I sought authority at the meeting on the 6th to attempt—my specific thrust was that even though the Secretary had determined that he would not support extraordinary relief under Public Law 85–804, I wanted the authority and permission to try to negotiate a resolution of the issues within the boundaries of the contract, without any extraordinary relief. Again, this was our top priority program, I didn't know whether I would be successful at doing that, but given the fact it was so important to the Navy, I wanted to give it a try, and—
> ... I did not personally think that the only possible way out of this was extraordinary relief....
> I persisted and asked again that I be given an opportunity. [Yockey] heard me out, he considered it, and he reaffirmed for me that he no longer supported the program and that there

would be—he would not authorize the release of additional funds.

**32.** Anticipatory repudiation might qualify as a post hoc justification if it had occurred because a cure notice would not have been necessary.

> [W]henever there is a positive, definite, unconditional, and unequivocal manifestation of intent ... not to render the promised performance when the time fixed therefor by the contract shall arrive, the contracting officer is not required to go through the useless motions of issuing a preliminary "10–day cure" notice even though the time for performance has not yet arrived, but may terminate forthwith on the ground of anticipatory breach.

*Mission Valve and Pump Co., Div. of Mission Mfg. Co.,* ASBCA Nos. 13552, 13821, 69–2 BCA ¶ 8010 at 37,243, 1969 WL 718 (1969). Defendant indicated in hearings in preparation for trial in 1995 that it did not have evidence in addition to that presented in the Count XVII trial to support anticipatory repudiation. *See* September 14, 1995 Order.