**McDONNELL DOUGLAS CORPORA-
TION and General Dynamics
Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 91–1204C.**

United States Court of Federal Claims.

Feb. 5, 1997.

---

Caryl A. Potter, III, Sonnenschein, Nath & Rosenthal, Washington, D.C., for plaintiff McDonnell Douglas Corporation, with whom was John W. Walbran, McDonnell Douglas Corporation, of counsel; Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, Washington, D.C., for plaintiff General Dynamics Corporation.

Bryant G. Snee, United States Department of Justice, Washington, D.C., for defendant, with whom was George P. Williams, Office of the General Counsel, Department of the Navy, of counsel.

### OPINION AND ORDER

HODGES, Judge.

Plaintiffs McDonnell Douglas and General Dynamics entered into a full-scale engineering and development contract with the Navy in 1988 to develop the A–12 aircraft. The Navy terminated the contract for default in 1991. We converted the termination for default to a termination for the convenience of the Government. *McDonnell Douglas Corp. v. United States*, 35 Fed.Cl. 358 (1996).

The parties asked that we interpret the incremental funding clause of the contract and its effect on plaintiffs' recovery of incurred costs. The purpose of this Opinion is to explain the court's determination that the incremental funding clause (H–7)[1] limits plaintiffs' cost recovery to the funds obligated at the time of termination: $3,499,793,-515.[2] *McDonnell Douglas Corp. v. United States*, No. 91–1204 (Fed.Cl. Aug. 30, 1996).

Plaintiffs raise intriguing legal arguments in their motion for summary judgment on Counts IV and V, but we do not find it necessary to rule on these theories to dispose of this case at the trial court level.[3] Counts IV and V present alternatives to our reasons for converting to a termination for convenience, and they may be presented on appeal.

Plaintiffs also request a ruling that the Government cannot impose a loss adjustment based on unfunded work because we have held that the Government is not liable for contract work beyond the cumulative amounts obligated at the time of termination. Plaintiffs argue that a loss adjustment would be improper because it assumes that the contractors had a duty to perform the entire contract prior to full funding. We are not permitting the Government to apply a loss ratio at all. *See McDonnell Douglas Corp. v. United States*, 37 Fed.Cl. 270 (1996). Therefore, it is not necessary to address this point.

### I.

The A–12 contract required the design, development, manufacture and delivery of eight aircraft. It was a fixed-price incentive contract with a target price of $4,379,219,436 and a ceiling price of $4,777,330,294. Congress did not appropriate full funding for the contract at the time of award. A schedule included in the H–7 clause set forth the dates and amounts of installments over the five-year life of the contract:

---

1. The H–7 clause is the Navy's version of the Limitation of Government Obligation (LOGO) clause. *See infra* note 7.

2. Plaintiffs total claim for incurred costs is $4.003 billion. This figure consists of $3.661 billion in costs for the FSED portion of the contract, $221 million for the Lot 1 option and $30 million for the Lot 2 option. Plaintiffs also seek $91 million in prime contractor termination settlement expenses and post-termination security costs. Lots 1 and 2 were separate provisions in the A–12 contract that were not governed by the H–7 clause. Therefore, recovery under these options will not be limited by our construction of the FSED portion of the contract. Recovery under Lots 1 and 2 is not in dispute.

3. In their motion for summary judgment on Counts IV and V of the complaint, plaintiffs ask that we address the effect of the H–7 clause on the parties' performance obligations. Plaintiffs argue that the cure notice and subsequent termination for default were improper because plaintiffs were entitled to stop work when funds were exhausted. We decided that the termination for default was improper on separate grounds, *McDonnell Douglas Corp. v. United States*, 35 Fed.Cl. 358 (1996), so we do not address those arguments here. Plaintiffs also assert that because the Government was not permitted to assess their performance prior to full funding, the termination for default was improper. For the reasons stated above, we also decline to address that argument.

*SCHEDULE*

H–7  *ALLOTMENT OF FUNDS APPLI-CABLE TO FSED ITEMS*

. . . .

(b) The Contractor agrees that the Government's obligation of funds in the amounts and by the dates set forth below will permit compliance with the contract. The Contractor acknowledges that the terms and conditions for the performance of this contract have been established on the basis that the Contractor's termination liability will not exceed the amount set forth below by the dates set forth opposite said amounts. Nothing herein shall authorize nor require the Contractor to incur costs, plus a reasonable allowance for profit, in excess of the total amount obligated at any given time. The Contractor may request the Government, but the Government shall not be obligated, to provide funds at a more rapid rate than described herein. The Contractor shall not be entitled to reimbursement of costs incurred by the Contractor through progress payments when the Contractor exceeds the amount of obligation specified herein. However, when amounts are obligated, any costs incurred by the Contractor prior to such obligation shall be allowable to the same extent as if such costs had been incurred after such amounts had been obligated.

| Installment | Date by Which Installment Will Be Obligated | Amt. of Obligation (not cumulative) |
|---|---|---|
| 1 | Date of Contract | $ 150,000,000.00 |
| 2 | 14 Jan 1988 | $ 616,000,000.00 |
| 3 | 01 Nov 1988 | $ 286,000,000.00 |
| 4 | 07 Jan 1989 | $ 861,300,000.00 |
| 5 | 01 Nov 1989 | $ 350,000,000.00 |
| 6 | 07 Jan 1990 | $1,050,000,000.00 |
| 7 | 01 Nov 1990 | $ 185,000,000.00 |
| 8 | 07 Jan 1991 | $ 553,200,000.00 |
| 9 | 01 Nov 1991 | $ 55,900,000.00 |
| 10 | 07 Jan 1992 | $ 167,600,000.00 |
| 11 | 01 Nov 1992 | $ 104,219,436.00 |

(c) In the event the Government fails to obligate any specified installment by the time specified, the Contractor will continue performance of the contract only to the extent that he shall not be required to incur obligations (termination liability) beyond that amount already obligated by the Government. If the Government fails to obligate any funds at the time specified

and there are not previously obligated funds remaining, the Contractor shall notify the Contracting Officer. After receipt of this notification, the Contracting Officer has thirty (30) days to provide additional funds or must issue a stop work order not to exceed a period of thirty (30) days. If the Contracting Officer issues a stop work order and then funds the contract price, delivery schedules, and terms and conditions of this contract shall be equitably adjusted, to the extent that it can be demonstrated by the Contractor that such failure to obligate funds affected contract cost and/or performance. **The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination.**

. . . .

(e) Nothing contained in this clause shall affect the right of the Government to terminate this contract pursuant to either the "Default" or "Termination for the Convenience of the Government" clauses.

A–12 FSED Contract, ¶ H–7 (emphasis supplied).

The sum of the installments listed in the H–7 clause equaled the target price of the contract. The difference between the target price and the ceiling price was not scheduled to be obligated under the contract. The contract included 58 line items of supplies and services to be furnished by the contractors. None of the funding installments under the schedule was tied to any particular line item. The contractors were required to provide the Government with quarterly reports calculating the actual and projected "accrued expenditures" as well as actual and projected termination costs.

## A. Contract Funding

In a fixed-price contract, the contractor is bound to complete work "at a fixed amount of compensation once adjusted regardless of costs of performance." John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 715 (2d ed. 1985). The contractor bears the risk of loss should its actual costs exceed the ceiling price of the contract.

The contractor is rewarded with increased profits when it reduces costs. *Id.* at 715–16. The Government's liability is limited by the contract price.[4]

■ A fixed-price incentive contract "provides for adjusting profit and establishing the final contract price by application of a formula based on the relationship of total final negotiated cost to total target cost. The final price is subject to a price ceiling, negotiated at the outset." FAR 16.403. The contract includes "reasonable and attainable targets" along with incentive arrangements designed to encourage specific efforts and discourage inefficiency and waste. FAR 16.401. The contractor's profit in a fixed-price incentive contract is based on actual performance. Cibinic & Nash, *Formation,* at 745. The parties set a target profit at the beginning of the contract that grows if the final cost of the contract is less than the target cost. Lane K. Anderson, et al., *Accounting for Government Contracts* § 1.03[1][c][i] (1996). If the final cost is greater than the target cost, profit is reduced correspondingly. *Id.* The contractor bears the risk of all costs in excess of the ceiling price. Cibinic & Nash, *Formation,* at 760. The focus of a fixed-price contract is contractor output.[5] Fixed-price contracts often are fully funded, but some are incrementally funded because of the high cost of many research and development contracts.

■ Incremental funding is a one-year appropriation to a multi-year contract. Multi-year funding is "Congressional authorization and appropriation covering more than 1 fiscal year." FAR 17.101. A multi-year contract binds the parties for more than one year, but funds need not be appropriated beyond the current year. The A–12 contract was a multi-year contract but it was not multi-year funded.

■ Plaintiffs contend that this incrementally funded, fixed-price contract was actually a series of cost-reimbursement contracts until full funding. Contractual duties differ markedly between fixed-price contracts and cost-reimbursement contracts. The "best efforts" standard summarizes the

> basic nature of the cost-reimbursement contract.... Unlike a fixed-price contract, under which the contractor is obligated to deliver the material or service for the stated price, a cost-reimbursement contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price.
>
> If, despite its best efforts, the contractor cannot meet the contractual requirements, the government has obtained precisely what it bargained for, namely, the contractor's best efforts. The contractor therefore is entitled to receive or retain its costs for what it has done. The government's only right is to the product or services, plans, and equipment for which the contractor was or will be paid under the contract.

*General Dynamics Corp. v. United States,* 229 Ct.Cl. 399, 410–11, 671 F.2d 474 (1982) (dicta). Thus, the focus of a cost-reimbursement contract is contractor input, not output.

■ In a cost-reimbursement contract, the Government agrees to pay the contractor for all allocable and allowable costs incurred under the contract. Cost-type government procurement contracts limit the duties of contractors to perform and the Government to pay. The Limitation of Cost clause provides that when the contractor exhausts available funds, it has no further duty to perform and the Government has no duty to reimburse the contractor for costs incurred in excess of the contract price. Cibinic & Nash, *Formation,* at 737.

---

4. Of course, if the contractor is entitled to equitable adjustments, the contract price increases accordingly. Plaintiffs have asserted that they are entitled to equitable adjustments on this contract, but we will not hear evidence on those arguments. *See McDonnell Douglas Corp.,* 37 Fed.Cl. 270 (1996). We address the interpretation of the contract's H–7 clause in this Opinion, not issues of fact.

5. This is true of all fixed-price contracts except fixed-price level of effort contracts which operate more like cost-reimbursement contracts with limitation of costs clauses. The Government sets contract prices based on labor hours and when that price is reached, the contractor is relieved of any further liability.

In an incrementally funded cost-reimbursement contract, the Limitation of Funds clause requires the contractor to perform "up to the point at which the total amount paid and payable by the Government under the contract approximates but does not exceed the total amount actually allotted by the Government to the contract." John Cibinic, Jr. & Ralph C. Nash, Jr., *Cost Reimbursement Contracting* 934 (2nd ed. 1993) (quoting FAR 52.232–22). The contractor agrees to use its "best efforts" to perform the work and inform the Government when its costs will exceed the amount already allotted to the contract.[6] Cibinic & Nash, *Cost,* at 934. Typically, incrementally funded cost-reimbursement contracts state that the Government is "not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government" and "the Contractor is not obligated to continue performance ... or otherwise incur costs in excess of ... the amount allotted to the contract." FAR 52.232–22. The FAR authorizes no similar clauses for non-cost-reimbursement-type incrementally funded contracts.

6. An "allotment" in the Department of Defense is "the process by which commanders ... distribute their allocated funds to themselves ... or to other subordinate organizations." Ralph C. Nash & Steven L. Schooner, *The Government Contracts Reference Book* 18 (1992).

7. DAR Deviation 87–925 (identical to DAR Deviation 84–2–52):

*LIMITATION OF GOVERNMENT'S OBLIGATION*
    a. Of the total price ... the sum of $____ is presently available for payment and allotted to this contract. It is anticipated that from time to time additional funds will be allotted to this contract until the total price of these items is allotted.
    b. The Contractor agrees to perform or have performed work on the items up to the point at which, in the event of termination of this contract [for the convenience of the government] ... the total amount payable by the Government (including amounts payable in respect of subcontracts and settlement costs) ... would, in the exercise of reasonable judgment by the Contractor, approximate the total amount at the time allotted to the contract. The Contractor will not be obligated to continue performance of the work beyond that point. The Government will not be obligated in any event to pay or reimburse the Contractor in excess of

In 1984, the Defense Acquisition Regulatory Council authorized the use of a LOGO clause for certain fixed-price, incrementally funded contracts.[7] In 1985, the Navy chose to implement its own LOGO clause, designated H–7 in the A–12 contract. Plaintiffs argue that the two clauses are the same; each clause states that the contractor is not required to continue performance beyond the exhaustion of funds obligated and that the Government has no duty to pay the contractor beyond that amount.

## B. Contract Performance

In September 1990, the contractors notified the Navy that their present costs plus estimated termination liability exceeded cumulative obligated funding and that even the installments scheduled in November 1990 and January 1991 would not cure the deficiency. The contractors attributed cost overruns to "directed and constructive changes, superior knowledge, impossibility of performance, and mutual mistakes." They asked the Navy to accelerate funding "to preclude the possibility that the contractors [might] have to stop work under the contract." The contractors stated that they would continue

the amount from time to time allotted to the contract, regardless of anything to the contrary in the [termination for convenience clause].
    c. · It is contemplated that the funds presently allotted to this contract will cover the work to be performed ... If funds allotted are considered by the Contractor to be inadequate to cover the work to be performed until the [agreed date], the Contractor will notify the Contracting Officer in writing when, within the next 30 days, the work will reach a point at which, in the event of termination of this contract ... the total amount payable by the Government ... will approximate 85 percent of the total amount then allotted to the contract.... The Contractor will ... advise the Contracting Officer in writing as to the estimated amount of additional funds which will be required for the timely performance of the contract for a further period as may be specified in the contract.... If ... additional funds are not allotted by the date ... the Contracting Officer will ... terminate this contract [for the convenience of the Government].
    ....
    h. Nothing in this clause affects the right of the Government to terminate this contract pursuant to the clause of this contract entitled "Termination for Convenience of the Government."

to work but would not waive their rights and remedies under the contract.

The contracting officer responded in October that the Government had met all of its duties under the H–7 clause and that the contractors were bound to their contractual duties. He stated that the Government had "no other obligation under the terms of the [H–7] clause, or any other provision of the contract, to provide additional funds beyond those required to be provided under the schedule set forth in subject clause." In November the Navy obligated $185,000,000 to the contract according to schedule. The contractors' calculated termination liability still exceeded the amount of obligated funds and they included these calculations in their quarterly report to the Navy.

The contracting officer issued a cure notice on December 13, 1990. Performance was "unsatisfactory," according to the CO, because the contractors would not deliver the aircraft on schedule and they had failed to meet specification requirements. The notice required the contractors to cure the problems before January 2, 1991. The contractors responded that their "obligation prior to full funding [was] limited to performance within the available funding." The contracting officer terminated the contract for default on January 7, the day the next funding installment was to have been obligated.

All of the steps necessary to obligate the January 1991 funds to the contract had taken place prior to the default termination, except one. Funds could be obligated to the contract only by formal contract modification and no contract modification was executed for the January installment.

## II.

### A. Constructive Obligation

■ Plaintiffs argue that the contracting officer had decided to obligate the January 1991 installment and only the ministerial act of executing the modification remained. They acknowledge that all of the steps necessary for obligation had not taken place: "[Plaintiffs] have never alleged that the funds were literally obligated. There is no question about the fact that the contracting officer had not signed his name on the modification. So they have not been literally obligated." Aug. 23, 1996, Tr. at 197. For each "obligation" of funds in this contract, a formal modification makes the installment funds available to the contract.

The interference of the Office of the Secretary of Defense (OSD) prevented the obligation, plaintiffs argue. If Undersecretary of Defense (Acquisition) Yockey had not withdrawn his support for the A–12 program, the contracting officers, Mr. Mutty and Admiral Morris, would have signed the contract modification obligating the January installment. This installment should be deemed available, according to plaintiffs, because OSD actions improperly usurped the Navy's discretion with regard to contract termination or continuance. *See McDonnell Douglas Corp. v. United States,* 35 Fed.Cl. 358 (1996).

The term "obligate" is not defined in the contract. An obligation is "a definite commitment by the Government to spend appropriated funds. Obligations may not be made prior to the enactment of an appropriation or other statutory authority. A binding contract is an obligation." Nash & Schooner, *supra,* at 279. Black's Law Dictionary defines "obligation" as follows: "To bind oneself by an obligation or promise ... to execute a written promise or covenant." BLACK'S LAW DICTIONARY 741 (6th ed. 1991).

The Comptroller General has determined that funds are obligated when there is a "legal duty on the part of the United States which constitutes a legal liability or which could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States...." 42 Comp.Gen. 733 (1963). In this case, the Government had no duty to accelerate funding: "The Contractor may request the Government, but the Government shall not be obligated, to provide funds at a more rapid rate than described herein." ¶ H–7(b). Moreover, plaintiffs' actions could not have created such a liability for the Government. The Government's duty in January 1991 was defined by the contract, not by plaintiffs' actions.

The contract was not modified to obligate the January 1991 installment. Plaintiffs argue that the CO's opinion that the funds *would* be obligated is sufficient to obligate those funds to the contract. The Court of Claims has determined that an internal memorandum was sufficient to bind the Government to fund a cost overrun. *General Electric Co. v. United States,* 188 Ct.Cl. 620, 412 F.2d 1215, *reh'g. denied* 189 Ct.Cl. 116, 416 F.2d 1320 (1969). In that case, a contracting officer in Boston recommended to the Illinois office that the overrun be funded.[8] The court found that the Boston CO had appropriate authority, and his recommendation was a "final decision" by a CO sufficient to bind the Government. *General Electric,* 188 Ct.Cl. at 627. Plaintiffs here contend that an internal memorandum dated December 19, 1990, coupled with other internal documentation, constitute a final decision by the CO sufficient to obligate the January 1991 installment.

We believe these materials lead to the opposite conclusion: "The $553.2M will be executed on a contract mod NLT 7 January 1991, assuming Service Acquisition Executive authorization at a minimum." Mutty Memo. for Record, Dec. 19, 1990. The "final decision" plaintiffs refer to is in fact conditioned on executive authorization. Mr. Mutty's memorandum does not decide the merits of a claim by plaintiffs. *General Electric,* 188 Ct.Cl. at 629. Mr. Mutty expressed concerns about continuing the program beyond the current year: "[D]efer further obligation of funds against the FSD contract until the SECDEF issues direction regarding program continuation (based on [Secretary Cheney's 'show cause' letter to Navy])." Mutty Memo. for Record, Dec. 19, 1990.

The Federal Circuit has ruled that the absence of a formal document execution is not fatal to a government "obligation." *Texas Instruments, Inc. v. United States,* 922 F.2d 810 (Fed.Cir.1991). But even if a formal contract modification were not necessary

in this instance, the contracting officer did not express an "unfettered opinion" about the January 1991 installment. *Id.* at 814 (citing *General Electric,* 188 Ct.Cl. 620, 412 F.2d 1215). When he drafted the memorandum, no outstanding negotiation or contractor claim requiring a final decision by the CO was in place. The memorandum merely referenced procedures for an upcoming funding installment.

We converted the default termination to one for convenience because government officials abdicated their discretion in terminating the contract for default. *McDonnell Douglas Corp.,* 35 Fed.Cl. at 371. Plaintiffs have obtained their remedy for the improper termination. Constructive obligation of the January 1991 installment would afford relief that we have no authority to grant. We cannot infer an obligation of funds that conflicts with contract requirements.

### B. Estoppel

■ Plaintiffs argue that the Government cannot induce plaintiffs to incur costs in excess of obligated funds and then limit plaintiffs' recovery under a limitation clause. This is essentially an estoppel argument. The contractors informed the Navy repeatedly that their termination liability exceeded obligated funds. They asked the Government to accelerate funding to cover these costs, but the Government demanded continued performance instead, according to plaintiffs. Defendant told plaintiffs that funds would be obligated only as scheduled. Continued performance, according to plaintiffs, forced them to incur costs in excess of the obligated funds, and in violation of the H–7 clause and the Anti–Deficiency Act.

In order to prevail on their estoppel argument, plaintiffs must show the following:[9]

(1) the party to be estopped must know the facts, i.e. the government must know of the overrun;

(2) the government must intend that the conduct alleged to have induced continued

---

8. This cost-plus contract was peculiar in that contracting authority was divided between on-site administration by an Army office in Boston and funding authority retained in the Army weapons center in Illinois.

9. This court has questioned whether an estoppel argument can be made against the Government. *Tri–O v. United States,* 28 Fed.Cl. 463, 473 (1993) (citing *OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990)).

performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance;

(3) the contractor must not be aware of the facts, i.e. that no implied funding of the overrun was intended; and

(4) the contractor must rely on the government's conduct to its detriment.

*American Electronic Laboratories v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985). Plaintiffs' argument fails on the third requirement, if not on others. The Government's position was clear. The contractors could not have assumed that the Government had promised to accelerate the funding schedule.

The Boards have held that when the Government indicates a willingness to fund cost overruns, the Government will be bound to fund such overruns. *Wind Ship Development Corp.,* DOTCAB 1215, 83–1 BCA ¶ 16135 at 80,159. However, neither the October 3 letter nor the cure notice [10] demonstrates the Government's willingness to cover plaintiffs' cost overruns. In fact, defendant's position was clear: no additional funds would be obligated to meet the funding gap. Plaintiffs could hardly have construed those documents to mean that defendant would pay for any costs in excess of obligated funds. The Government in *Wind Ship Development* was obligated to cover contractor costs under an express cost-reimbursement contract. Thus, the Board's decision that the Government should cover cost overruns was not the deviation from original contract terms that plaintiffs ask us to permit here.

■ Plaintiffs cited cases that hold the Government liable for cost overruns involve cost-reimbursement contracts, not fixed-price contracts. *Solar Turbines, Inc. v. United States,* 23 Cl.Ct. 142, 156 (1991); *Wind Ship Dev. Corp.,* DOTCAB 1215, 83–1 BCA ¶ 16135; *Thiokol Chem. Corp.,* ASBCA 5726, 60–2 BCA ¶ 2852. This is an important distinction. Under a cost-reimbursement contract, the Government agrees at the outset to compensate contractors for incurred costs.

In a fixed price contract, the Government's obligation is set at the time of the contract award and will not be increased as the contract is performed unless changes are ordered. The contractor's fixed-price performance obligations require it to produce an item for a pre-determined price. A decision by this court to obligate the January 1991 installment by estoppel is a remedy for which we can find no support.

## C. Alternative Funding Sources

■ Plaintiffs argue that other sources of funds should be available to cover their incurred costs beyond the H–7 cap. Specifically, they contend that the Economic Price Adjustment (EPA) and the Incentive Price Redetermination (IPR) provisions are independent of the H–7 clause.

The EPA clause provides that

[a] modification of the contract shall be issued making necessary changes in the contract targets/ceilings, for items delivered and to be delivered, to reflect the adjustments determined....

. . . .

The target cost, target price and ceiling price of the contract are subject to economic price adjustments related to tasks in accordance with the provision of this Part II.

A–12 FSED Contract, ¶ H–56. Any upward adjustments made pursuant to the EPA clause raise the target and ceiling price of the contract, according to plaintiffs. Plaintiffs argue that they may charge excess development costs to the EPA funding clause irregardless of H–7 limits.

The IPR clause adjusts the price of specific items to permit the contractors and the Government to share costs above the target price but below the ceiling price. This mechanism was not part of the H–7 schedule, so it operates without H–7 funding constraints and can provide funds for a portion of plaintiffs' incurred costs, according to plaintiffs.

---

10. The show cause memorandum from OSD prompted the issuance of the cure notice. *McDonnell Douglas Corp.,* 35 Fed.Cl. at 364. The reason for issuing the cure notice, however, is not important to this Opinion.

Plaintiffs describe the IPR and EPA provisions as contingent liabilities of the Government at the time of contract formation. The contracting officer stated in his December 1990 memorandum for the record:

> FY 1990 funds in the amount of $50 M were budgeted for the FSD contract ceiling and EPA requirements. NAVAIR Comptroller and legal opinions preclude obligation of funds against the contract for costs above target price prior to the contractor *incurring* (vice merely *projecting*) costs in excess of the target price; the PMA projects that the contractor will incur costs above target in 1992.

M. Mutty Memo. for Record, Dec. 19, 1990. Plaintiffs seem to claim that Mr. Mutty's reference to funds budgeted under these provisions is sufficient to obligate these funds. However, a contract modification was required to obligate the funds. *See* ¶ H–14(e).

The EPA and IPR clauses are not alternative funding vehicles by which plaintiffs may recover their excess incurred costs. The EPA clause was designed to adjust target and ceiling prices if the economy fluctuated according to the indices set forth in the clause. No adjustment was permitted under the EPA prior to 1990 and none was made.

The IPR clause was designed to adjust the final contract price to share costs between the parties. Both the IPR and EPA clauses require formal contract modifications in order to obligate funds. No formal modifications were executed under the IPR or EPA. Plaintiffs cannot recover funds that *may* have been obligated had certain prerequisites been met.[11]

### Conclusion

For the reasons stated, plaintiffs' incurred cost recovery is limited to $3,499,793,515.

11. We note that plaintiffs raised the issue of alternative funding sources rather recently, and defendant's response has been perfunctory. Defendant states correctly that Clause H–14(j) is the key to IPR liability. Unfortunately, defendant merely begs the question when it states that "the *Incentive Price Revision* clause applies only to completed items accepted by the Government.... Therefore, clause H–14 does not apply to the issues before the court." A number of items evidently were accepted by the Govern-

Plaintiffs' motion for summary judgment on Counts IV and V is denied as moot because we have already converted the termination for default to a termination for the convenience of the Government. The parties have stipulated damages in preparation for appeal. The Clerk will enter judgment in the amount stipulated upon notice from the Court.

ment during contract performance. We have no information about these items. Counsel should advise the court whether costs affected by EPA or IPR clauses, if any, are a part of damages stipulated for the purposes of appeal; or whether an evidentiary hearing is necessary to resolve this issue. Counsel are reminded that we would' not address proof of costs that implicates matters that we have excluded from this case. *See* *McDonnell Douglas Corp.*, 37 Fed.Cl. 270 (1996).