McDONNELL DOUGLAS CORPORA-
TION and General Dynamics
Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91–1204C.

United States Court of Federal Claims.

Dec. 5, 1997.

Caryl A. Potter, III, Sonnenschein, Nath & Rosenthal, Washington, DC, for plaintiff McDonnell Douglas Corporation, with whom was John W. Walbran, McDonnell Douglas Corporation, of counsel; Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, Washington, DC, for plaintiff General Dynamics Corporation.

Bryant G. Snee, United States Department of Justice, Washington, DC, for defendant, with whom was George P. Williams, Office of General Counsel, Department of Navy, of counsel.

## OPINION AND ORDER

HODGES, Judge.

By order dated August 30, 1996, we limited plaintiffs' incurred cost recovery to the amount of funds formally obligated to the Full Scale Development (FSED) portion of the A–12 Contract at the time of termination: $3,499,793,515. Plaintiffs argued that they were entitled to funds obligated at the time of termination not only by formal modification, but also by constructive obligation or express terms of the contract. The "constructive obligation" theory derived from plaintiffs' argument that they were entitled to the January 1991 scheduled installment even though the modification had not been signed. We ruled that funds could not be obligated without a contract modification in such circumstances. *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295 (1997).

In Footnote 11 of the February 5, 1997 Opinion and Order we solicited an explanation of defendant's response to plaintiffs' argument that alternative sources of funding were available beyond the $3.5 billion "cap." This was an issue that we did not consider to be substantive in light of the pending stipulation of damages. Plaintiffs argued that Clause H–14, the Incentive Price Revision clause (IPR), and Clause H–56, the Economic Price Adjustment clause (EPA), entitled them to funds beyond the $3.499 billion obligated by modification. This issue had been briefed, but only "perfunctorily," we stated. The August 30, 1996 Order establishing a $3.499 billion cap was interpreted by the parties to include funds authorized by the IPR and EPA clauses. We did not intend this result. ·

## BACKGROUND

The Navy contracted with plaintiffs in 1988 to develop the A–12 stealth aircraft. The contract had an initial target price of $4,379,-219,436 and an initial ceiling price of $4,777,-330,294. The Government terminated the contract for default on January 7, 1991, the same day that defendant was scheduled to obligate an additional $553.2 million to the contract. The contractors sued the Navy to convert the termination for default to a termination for convenience of the Government, and to recover incurred costs, profits, and equitable adjustments. The contractors also submitted a termination for convenience cost recovery claim for $4.003 billion to the contracting officer. That claim was deemed denied and plaintiffs appealed. *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 285 (1997). We converted the termination for default to one for convenience of the Government, *McDonnell Douglas Corp. v. United States,* 35 Fed.Cl. 358 (1996), and limited plaintiffs' recovery to incurred costs

not to exceed $3.499 billion, *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295 (1997).

At the time of termination, the Government had accepted and paid for six of 58 contract line items (CLINs). Plaintiffs were paid $1.334 billion for the accepted CLINs at the adjusted billing prices set forth in modification P00052. The price adjustments above target price for these items totaled $127.083 million ($109.776 million in IPR adjustments and $17.307 million in EPA adjustments).[1] Such adjustments were paid as part of liquidated progress payments. No modification adjusted the final prices for these items, and no modification obligated funds above target price.

Plaintiffs contend that the incurred cost limitation of $3.499 billion artificially limits their cost recovery claim. The Government acknowledges paying the contractors most of the adjustments above the original contract target price for the six accepted CLINs. Defendant also concedes that the contract scheduled funding to satisfy liabilities up to target price only. The issue is whether plaintiffs are entitled to prove an additional $135 million in incurred costs.

### I. Contract Funding Clauses

#### A. Clause H–56—Economic Price Adjustment Clause

The Economic Price Adjustment Clause was established to adjust the target cost, target price, and ceiling price of the contract.[2] Any such adjustments were to be made by contract modification.

A modification of the contract shall be issued making necessary changes in the contract targets/ceilings, for items delivered and to be delivered, to reflect the

---

1. The $17.307 million billing price adjustment for EPA adjustments proved to be a low estimate. The final economic price adjustment for calendar year 1990 would have been $26,194,377. Under clause H–14, the incentive price revision for the six delivered and accepted CLINs would have been $109,779,484. The issue is whether plaintiffs are entitled to prove an additional $135,-973,861 in incurred costs beyond the $3.5 billion funding limit.

2. The target cost of the contract is the amount the parties assumed that the contractors would expend in producing the contract line items. The target price is the amount the Government expected to pay to the contractors for the CLINs, including target profit. The ceiling price is the maximum amount the Government would pay the contractors for the CLINs.

adjustments determined under [the implementation part] of this provision. H–56, Part I, G.

PART II, the "implementation part," includes formulae for calculating price adjustments according to Bureau of Labor Statistics indexes that measure materials and labor cost fluctuations in the aircraft industry. As materials and labor costs rise throughout the industry during the term of the contract, original target values are adjusted proportionately upward so that the contractor does not bear costs unrelated to its own performance.

An upward EPA adjustment reflects increased cost, and credits the contractor for the amount of increase by reestablishing higher values for target cost, target price, and ceiling price. If the Bureau of Labor Statistics indexes indicate that the cost of materials used in the aircraft industry is five percent higher in 1990 than in 1988, the contract's target cost, target price, and ceiling price must be increased proportionately. Otherwise, price revision calculations would attribute to the contractor costs common to the entire industry. EPA adjustments must be made before an accurate price revision modification can be executed.

No adjustments were to be made under H–56 in the calendar years before 1990. The EPA clause did not include a termination provision.

## B. Clause H–14—Incentive Price Revision Clause[3]

The IPR clause was designed to establish the total final contract price not to exceed the contract ceiling price. Total final price was to be determined according to negotiated costs, the degree to which negotiated costs departed from target costs, and profit (including any adjustments thereto). Final cost and profit adjustments could be made above target price, but no adjustment could exceed the ceiling price.

The IPR clause requires contracting parties to negotiate total final cost, following the submission of cost data for items delivered and accepted. H–14(d)(1). Total final price is determined by applying an adjustment for profit or loss to final negotiated cost. For example, if final negotiated cost exceeds tar-

---

**3.** H–14 *INCENTIVE PRICE REVISION—FIRM TARGET*

(a) *General.* The supplies or services identified in the Schedule as Items 0001 through 0058 are subject to price revision in accordance with this clause; *provided,* that in no event shall the total final price of these items exceed the ceiling price of Four Billion Seven Hundred Seventy-seven Million, Three Hundred Thirty Thousand Two Hundred Ninety-four dollars ($4,777,330,294).

. . . .

(c) *Data Submission.*
(1) Within 120 days after the end of the month in which the Contractor has delivered the last unit of supplies and completed the services specified by item number in paragraph (a) above, the Contractor shall submit on Standard Form 1411 or in any other form on which the parties agree—
(i) A detailed statement of all costs incurred up to the end of that month in performing all work under the items;
(ii) An estimate of costs of further performance, if any, that may be necessary to complete performance of all work under the items;
(iii) A list of all residual inventory and an estimate of its value; and
(iv) Any other relevant data that the Contracting Officer may reasonably require.

. . . .

(d) *Price revision.* Upon the Contracting Officer's receipt of the data required by paragraph (c) above, the Contracting Officer and the Contractor shall promptly establish the total final price of the items specified in (a) above by applying to final negotiated cost an adjustment for profit or loss, as follows:
(1) On the basis of the information required by paragraph (c) above, together with any other pertinent information, the parties shall negotiate the total final cost incurred or to be incurred for supplies delivered (or services performed) and accepted by the Government and which are subject to price revision under this clause.
(2) The total final price shall be established by applying to the total final negotiated cost an adjustment *for profit or loss, as follows:*
(i) If the total final negotiated cost is equal to the total target cost, the adjustment is the total target profit.
(ii) If the total final negotiated cost is greater than the total target cost, the adjustment is the total target profit, less forty percent of the amount by which the total final negotiated cost exceeds the total target cost.
(iii) If the final negotiated cost is less than the total target cost, the adjustment is the total target profit plus forty percent of the amount by which the total final negotiated cost is less than the total target cost.
H–14.

get cost, total final price is the sum of final negotiated cost plus target profit less forty percent of the amount by which final negotiated cost exceeds target cost. H–14(d)(2)(ii). Thus, as the contractor's costs rise above target cost, profits fall. Conversely, profits increase when final costs are less than target cost. If final negotiated cost is less than target cost, total final price is the sum of final negotiated cost, target profit, and forty percent of the amount by which final negotiated cost is less than target cost. H–14(d)(2)(iii). If final negotiated cost equals target cost, total final price is the sum of target cost and target profit, or target price. H–14(d)(2)(I). Total final price is to be "evidenced by a modification to this contract, signed by the Contractor and the Contracting Officer." H–14(e).

Target prices are known in advance, but unless total negotiated cost equals target cost, price adjustments are made to share costs or cost savings according to the price revision component of the contract. Conversely, if total negotiated cost equals target cost, no adjustment is necessary because total final price would equal target price. Thus, the total final price modification mandated by H–14(e) was intended to acknowledge formally adjustments generated by H–14(d). The modification was also intended to be the basis for ensuring proper payment:

> After the contract modification establishing the total final price is executed, the total amount paid or to be paid on all invoices or vouchers shall be adjusted to reflect the total final price, and any resulting additional payments, refunds, or credits shall be made promptly.

H–14(f)(3).

Pending execution of the price revision modification, the contractor is required to submit invoices or vouchers corresponding to certain billing prices established to meet contract target prices. The contractor also must submit certain data to the contracting officer.[4] If it appears that the final cost of the items will exceed their target costs substantially, the contracting parties can "negotiate an increase in billing prices by any or all of the difference between the target prices and the ceiling price...." H–14(f)(2). Such an increase would be reflected in a contract modification. H–14(f)(3). However, "[a]ny billing price adjustment ... reflected in a contract modification ... shall not affect the determination of the total final price under paragraph (d) above." *Id.*

Billing prices may be adjusted during contract performance so that as items are delivered and accepted by the Government, the contractor can invoice for and be paid roughly the amount of liquidated progress payments the Government would have agreed to pay the contractor had all payments been withheld until contract performance was completed. If it is determined that the contractor over-billed the Government, the contractor must reimburse or credit the Government for that amount.

H–14 provides that if the contract is terminated before the total final price is established, "prices of supplies or services subject to price revision shall be established in accordance with this clause for (1) completed supplies and services accepted by the Government...." H–14(j). That is, when a contract is terminated, final prices for items delivered and accepted should be established according to H–14, making adjustments from target prices if necessary.

H–14 contemplates two independent modifications. One is optional and modifies billing prices when it appears likely that they are too low. H–14(f). The other is manda-

---

4. The information referred to was to be submitted to the contracting officer quarterly by reports showing:

  (i) the total contract price of all supplies delivered and accepted and for which final prices have been established;

  (ii) the total costs (estimated to the extent necessary) reasonably incurred for, and properly allocated to, the supplies delivered and accepted by the Government and for which final prices have not been established;

  (iii) the portion of the predetermined target profit that is in direct proportion to the supplies for which final prices have not been established, adjusted by subparagraph (d)(2), when the total cost amount derived from (ii) above differs from the aggregate target costs of the supplies; and

  (iv) the total amount of all invoices or vouchers for supplies delivered and accepted by the Government.

tory and modifies total final price after appropriate adjustments. H–14(e). Neither modification formally obligates funds to the contract.

### C. Clause H–7[5]

H–7 limited the Government's liability to the amount of funds obligated at the time of termination. The clause required incremental funding in certain amounts at specified dates for the duration of the contract.

The total amount of installments equals the contract target price of $4.379 billion. Thus, H–7 schedules funding sufficient only to reimburse and reward contractors for containing costs at or below target cost. Allowable costs incurred up to target cost may be reimbursed through H–7 funds. Profit also may be available through H–7 depending upon whether price adjustments are necessary. Funding for allowable costs incurred above target cost, however, is not scheduled.

H–7 sought to limit the Government's liability. "The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination." A–12 FSED Contract, ¶ H–7(c).

### II. Contentions of the Parties

#### A.

Plaintiffs argue that liquidated progress payments of $127 million made to reimburse the contractors for costs incurred above initial target prices were derived improperly from funds obligated under H–7. Such payments should have been charged to the IPR and EPA clauses, according to plaintiffs. Because payments appear to have been made through funds obligated under H–7, plaintiffs contend that they are entitled to prove an additional $135 million in allowable costs in-

---

**5.** H–7 *ALLOTMENT OF FUNDS APPLICABLE TO FSED ITEMS*

....

(b) The Contractor agrees that the Government's obligation of funds in the amounts and by the dates set forth below will permit compliance with the contract. The Contractor acknowledges that the terms and conditions for the performance of this contract have been established on the basis that the Contractor's termination liability will not exceed the amount set forth below by the dates set forth opposite said amounts. Nothing herein shall authorize nor require the Contractor to incur costs, plus a reasonable allowance for profit, in excess of the total amount obligated at any given time. The Contractor may request the Government, but the Government shall not be obligated, to provide funds at a more rapid rate than described herein. The Contractor shall not be entitled to reimbursement of costs incurred by the Contractor through progress payments when the Contractor exceeds the amount of obligation specified herein. However, when amounts are obligated, any costs incurred by the Contractor prior to such obligation shall be allowable to the same extent as if such costs had been incurred after such amounts had been obligated.

| Installment | Date by Which Installment Will Be Obligated | Amt. of Obligation (not cumulative) |
|---|---|---|
| 1 | Date of Contract | $150,000,000.00 |
| 2 | 14 Jan 1988 | $616,000,000.00 |
| 3 | 01 Nov 1988 | $286,000,000.00 |
| 4 | 07 Jan 1989 | $861,300,000.00 |
| 5 | 01 Nov 1989 | $350,000,000.00 |
| 6 | 07 Jan 1990 | $1,050,000,000.00 |
| 7 | 01 Nov 1990 | $185,000,000.00 |
| 8 | 07 Jan 1991 | $553,200,000.00 |
| 9 | 01 Nov 1991 | $55,900,000.00 |
| 10 | 07 Jan 1992 | $167,600,000.00 |
| 11 | 01 Nov 1992 | $104,219,436.00 |

(c) In the event the Government fails to obligate any specified installment by the time specified, the Contractor will continue performance of the contract only to the extent that he shall not be required to incur obligations (termination liability) beyond that amount already obligated by the Government. If the Government fails to obligate any funds at the time specified and there are not previously obligated funds remaining, the Contractor shall notify the Contracting Officer. After receipt of this notification, the Contracting Officer has thirty (30) days to provide additional funds or must issue a stop work order not to exceed a period of thirty (30) days. If the Contracting Officer issues a stop work order and then funds the contract price, delivery schedules, and terms and conditions of this contract shall be equitably adjusted, to the extent that it can be demonstrated by the Contractor that such failure to obligate funds affected contract cost and/or performance. The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination.

....

(e) Nothing contained in this clause shall affect the right of the Government to terminate this contract pursuant to either the "Default" or "Termination for the Convenience of the Government" clauses.

H–7.

curred up to target price at the time of termination.

Plaintiffs assert that their damages have been limited artificially by our August 30, 1996 Order capping their incurred cost recovery at $3.499 billion. H–7 funds allegedly were allocated to pay the contractors the target price of the contract. The Government paid $109 million in IPR adjustments to reimburse the contractors for costs incurred *above* target cost but below ceiling prices. Plaintiffs allege, however, that the Government paid IPR amounts from funds already obligated under the H–7 clause. If the $109 million paid to the contractors were derived from another source (other than H–7), that would free up another $109 million within the $3.499 billion limit from which the contractors could attempt to establish incurred, allowable, and therefore reimbursable costs. *In short, the contractors argue that the Government acknowledged its duty to pay IPR adjustments, but it paid those adjustments improperly from funds not allocated to satisfy increased price adjustments.*

Plaintiffs acknowledge that Modification P00052 merely adjusted the contract *billing* prices by $109 million to reflect an increase from target prices up to ceiling prices on the six accepted items. The contractors also concede that no H–14(e) modification pursuant to H–14(j) was executed to establish total final prices for the accepted items. But plaintiffs note that they were *paid* $109 million due under H–14. That is, in addition to costs incurred for these items up to target costs, the contractors were reimbursed for costs up to ceiling price.

H–14(j) directs the parties to establish a total final price for the six accepted items at the time of termination. By the terms of the agreement, the Government and the contractors had a duty to execute a modification establishing total final prices. Had the contract been completed according to schedule, the Government would have been bound to negotiate and sign an H–14(e) modification. This duty was not discharged when the Government terminated the contract, the plaintiffs contend. To the contrary, the duty was triggered by the termination.

Plaintiffs claim that the Government's duty to make EPA adjustments arose at the time of termination. H–56, Part I, C states that the first of such price adjustments was to be made after 1990. "The economic price adjustment amount shall be determined after the close of each calendar year...." Part II, E. Plaintiffs argue that they are entitled to additional funds because the contract required an EPA determination by January 1, 1991.

### B.

Defendant cites the February 5 Order and Opinion for the proposition that a formal modification is necessary to bind the Government. Modification P00052 adjusted billing prices only; it specifically did not attempt to alter total final prices. It did not obligate funds.

Funds must be obligated before the contractors can be reimbursed for their incurred costs. Defendant correctly construes plaintiffs' argument here as an attempt to extract more money for cost reimbursement than was made available under H–7. According to defendant, the contract contains a single funding vehicle whose funds may be applied to the contract by modification only. P00052 is not the final price modification. The billing price adjustment stated explicitly that it altered billing prices only and did not change the target cost, target profit, target price, ceiling price, total final price, or the amount available for payment under H–7. This change merely allowed plaintiffs to liquidate progress payments made under H–7 at a faster rate. It did not entitle plaintiffs to treat H–14 as an alternative funding source, defendant argues.

Defendant also points out that plaintiffs have been compensated for most of the upward price adjustments. With the exception of a $9 million readjustment, allowable costs that correspond to the upwardly adjusted billing prices have been accounted for, according to defendant. Thus, when plaintiffs seek $135 million, they are asking for $127 million in additional compensation for the same work.

## DECISION

Clause H–7(c) of the contract states:

The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination.

We ruled that

[t]he EPA and IPR clauses are not alternative funding vehicles by which plaintiffs may recover their excess incurred costs.... Both the IPR and EPA clauses require formal contract modifications in order to obligate funds. No formal modifications were executed under the IPR or EPA.

*McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295, 304 (1997). The effect of our ruling was to deny plaintiffs the opportunity to expand the damage cap beyond the amount of funds obligated to the contract by modification.

The Government paid the contractors EPA and IPR adjustments totaling $127 million above the contract target price for the six accepted contract line items. The parties agree that if those adjustments were proper, the Government owes plaintiffs an additional $9 million.

The contract scheduled funding to satisfy liabilities up to the original target price only. Plaintiffs contend that the incurred cost limitation of $3.499 billion artificially limits their cost recovery claim. The issue is whether plaintiffs are entitled to prove an additional $135 million in incurred costs.

### I. IPR Liability

The H–7 clause schedules funds to reimburse the contractors for all items up to target price. The IPR clause was designed to reimburse the contractors for costs incurred (and possibly profit) above target price up to ceiling. Funding under this contract was to be segregated, if necessary. The contractors incurred costs in excess of target price for the six accepted contract line items. H–7 did not schedule funds to reimburse those costs. A careful review of the contract establishes that such reimbursement was to be funded through the IPR clause.

The A–12 contract was an "incentive" contract. Incentive contracts reward contractors for keeping costs below target cost with increased profits, and penalize contractors for incurring costs above target cost with reduced profits. The incentive component of the A–12 Contract did not disturb the Government's promise to reimburse the contractors for allowable costs incurred up to ceiling. H–7 was scheduled to fund up to target price only; it cannot be the sole source of funds under the contract. An alternative source of funds must be available to cover upward price adjustments derived from H–14(d).

The Comptroller General has defined the term obligation to mean a "legal duty on the part of the United States which constitutes a legal liability or which could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States...." 42 Comp. Gen. 733 (1963). We ruled that the January 7, 1991 H–7 installment was not obligated to the contract. *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295 (1997). However, the IPR clause created a legal obligation on the part of the Government at the time of termination.

"Nothing contained in this clause shall affect the right of the Government to terminate this contract pursuant to either the 'Default' or 'Termination for the Convenience of the Government' clauses." H–7(e). On January 7, 1991, the Government had the option of sending the contractors either a termination notice or a contract modification obligating the January installment. The Government exercised its right to terminate the contract. That the default termination has been converted to one for convenience does not change the fact that the contract was terminated before the obligation arose.

On the other hand, the Government assumed a duty to determine the final price of accepted and delivered items at the time of termination. H–14(j). Payment obligations, if any, would follow. H–14(f)(3). The fact that no such determination was made does not negate defendant's obligation to reach a final price. Defendant's failure to execute a contract modification under H–14(e) is not fatal to plaintiffs' claim. The legal duty to

negotiate final cost, determine appropriate profit, and pay final price, arose upon termination of the contract. The Government did not have the option of terminating the contract to avoid liability, as with the H–7 installment. In fact, the obligation arose in concert with the termination.

■ Contract line items had been accepted by the Government at the time of termination. H–14(j) directs the parties to establish a total final price for these items in accordance with the rest of H–14. That is, at the time of termination, there is an automatic requirement to issue a modification reflecting adjusted total final prices. Defendant has not explained why it did not comply with this requirement, except to allege lack of cooperation among the parties following termination.

■ To avoid additional liability, defendant has relied on language in H–7(c): "The Government's total obligation for payment (including termination settlement expenses) under this contract shall not exceed the total amount obligated at the time of termination." This provision has been offered to support defendant's assertion that the Government cannot be held liable for amounts in excess of the sums obligated to the contract at the time of termination. We agree.

H–14(j) requires the Government to determine a final price for accepted CLINs at the time of termination. We question the utility of this function if, as the Government in effect argues, it is liable only to reimburse the contractors for allowable costs incurred up to the target price. That is, the legal duty to arrive at a final price would be pointless if the Government were not required to obligate funds to cover costs incurred in excess of the H–7 installment schedule. The Government cannot discharge its duty to reimburse allowable contractor costs incurred up to ceiling; this would remove the incentive component of the contract. H–14 creates a duty at the time of termination that implies an obligation of funds. The H–7(c) liability limitation does not preclude funds obligated through H–14.

■ Defendant states that because plaintiffs have been paid their IPR costs, they cannot claim IPR payments beyond the cap.

This is not correct. Plaintiffs were paid an amount equal to the adjusted billing price of the CLINs as set forth in modification P00052. Part of that payment can be attributed to IPR costs incurred above target cost. However, the payment was derived from funds obligated under H–7. The effect was to deprive plaintiffs of $109 million of otherwise reimbursable incurred costs up to target. Unless we remove IPR funds from the cap, potentially allowable costs may not be recovered.

Modification P00052 does not establish the total final prices of the six accepted items, but it is strong evidence of the Government's obligation to reimburse the contractors. The fact that the contractors were paid these increased amounts is stronger evidence still.

## II. EPA Liability

■ The EPA analysis is similar to the IPR analysis. Although the contract requires a modification for EPA funds, one was not issued. The first possible EPA adjustment was to occur after the calendar year 1990. The contract was terminated on January 7, 1991. The Government's promise to determine the economic price adjustment for calendar year 1990 arose on January 1, 1991. The fact that the Government terminated the contract does not eliminate its duty to make EPA cost adjustments.

H–56 requires a modification to the contract to implement such changes. Defendant argues that no formal modification was issued to reestablish target values, so the Government was not required to fund beyond the amount provided in the H–7 clause. Plaintiffs reiterate their argument that P00052 evidences the Government's commitment to pay the contractors for these economic fluctuations, and that actual payment of $17.307 million is the strongest indication of the Government's obligation.

Plaintiffs request $26.194 million under the EPA clause because that amount corresponds to "items delivered *and to be delivered* ...." H–56, Part I, G. We limited plaintiffs' possible IPR recovery to costs associated with contract line items accepted by the Government because H–14(j) specifically controls the adjustment to those costs in the

event of a termination. No such limitation appears in H–56. The EPA clause adjusts costs related to all CLINs, whether delivered or to be delivered.

The Government's obligation to make an EPA adjustment became fixed at the end of calendar year 1990. That adjustment was an outstanding obligation in 1991. Appropriate adjustments should have been made to target cost, target price, and ceiling price. Defendant does not explain why those adjustments were not accomplished.

## CONCLUSION

The IPR and EPA clauses obligated funds to the FSED portion of the contract. They are not subsumed within H–7, however. H–7 supplies funds to pay for prices up to and including target price. IPR and EPA supply funds to pay for prices above original target price up to ceiling. Defendant cannot pay IPR and EPA adjustments from H–7. Such a practice would deny the contractors the opportunity to prove their entitlement to certain H–7 funds. It would also neutralize the "incentive" nature of the contract.

The H–7 funding cap of $3.499 billion remains in place, but it does not include funds obligated to cover $135 million in IPR and EPA adjustments. Those adjustments added to the H–7 cap create a total funding cap of $3,635,767,376. The H–7 cap includes $135 million of obligated funds that plaintiffs may prove were allowable, allocable, and reasonable.[6]

To the extent that they are inconsistent with this opinion, the August 30 Order, *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295 (1996), and the February 5 Opinion and Order, *McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295 (1997), are hereby MODIFIED.

IT IS SO ORDERED.

---

6. The Government does not challenge the allowability, allocability, or reasonableness of the IPR and EPA adjustments.